O'DONNELL AND ELIZABETH M. PATRICK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66799. Filed March 20, 1959.

*Thomas H. Krise, Esq.*, for the petitioners.
*Bernard J. Boyle, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in income tax and additions to tax of petitioners as follows:

| Year | Deficiencies | Additions to tax sec. 294(d)(2), I.R.C. 1939 |
|---|---|---|
| 1953 | $2,164.63 | -------- |
| 1954 | 3,704.18 | $335.23 |

The primary issue presented is whether certain improved and unimproved lots sold in 1953 and 1954 were, in the years in which said sales were made, held by petitioners for sale to customers in the ordinary course of business.

Subsidiary issues relating to self-employment taxes of O'Donnell Patrick for the years 1953 and 1954, and additions to tax for substantial understatement of estimated tax for 1954, are dependent upon our determination of the primary issue referred to above, and are to be determined under Rule 50.

### FINDINGS OF FACT.

O'Donnell and Elizabeth M. Patrick, husband and wife, filed joint Federal income tax returns for the calendar years 1953 and 1954 with the district director of internal revenue for the district of Indiana. In 1953, petitioners paid income tax in the amount of $5,321.90 by $4,208.39 through withholding, $400 by declaration of estimated tax, and final payment of $713.15 on or before March 15, 1954. In 1954, petitioners paid income tax in the amount of $6,263.19 by $3,872.20 through withholding, $400 by declaration of estimated tax, and final payment of $1,990.99 on or before April 15, 1955.

In July 1950, petitioners purchased, as tenants by the entireties, approximately 37 acres of unimproved real estate located in the vicinity of Michigan Road and 66th Street, Marion County, Indiana. The tract was approximately 9½ miles from the center of Indianapolis, in an area that had not been developed at the time of purchase. The closest business to the tract was a small drugstore and grocery, 7 blocks away.

The cost of the tract above referred to was as follows:

| | |
|---|---:|
| Original cost | $18,937.50 |
| Abstract | 35.00 |
| Improvements | 9,186.30 |
| Surveying | 971.00 |
| Utility (powerline) | 117.00 |
| Total | 29,246.80 |

The improvements consisted primarily of the construction of a gravel road on 67th Street, through the center of the tract, together with the construction of a drainage ditch. Petitioners did not make improvements on 66th Street which street had been previously constructed.

Petitioners' original purpose in purchasing the tract was to hold it as an investment and as a site for their residence. The purchase was made from joint funds.

At the time of the acquisition of the tract, and prior thereto, O'Donnell Patrick was a salesman and his wife was employed as a

stylist. At or about the time the construction of homes began on lots in said tract, O'Donnell Patrick, hereinafter sometimes referred to as petitioner, had the tract surveyed, measured, and numbered by lots.

Patrick entered into an understanding in 1952 with a builder in which it was planned that about 100 houses would be built on various lots in the tract. Two houses were started, but due to a disagreement with the builder, the arrangement with him fell through. Patrick completed the two houses and sold them in two separate transactions in 1952.

During the year 1953, Patrick, as a builder, built and sold two houses and during the year 1954 built and sold four houses. The sales price allocable to the improved lots (as distinguished from the sales price of the improvements) was as follows: Lot 15, $1,250; lots 18 and 19, $1,900.

Petitioner had six transactions involving the sale of improved and unimproved lots on the tract here under consideration during the year 1953, as follows:

| Lot involved (numbered) | Cost basis—lots, notice of deficiency |
|---|---|
| 1 | $463.40 |
| 2 | 372.05 |
| 4 | 403.37 |
| 8 | 424.13 |
| 15 | 361.99 |
| 18 and 19 ($361.99×2) | 723.98 |

Lots 1, 2, 4, and 8 were sold in 1953 without houses. Petitioner built a house on lot 15 and a house on lots 18 and 19. These two houses and lots were sold in 1953.

The total selling price of lots 1, 2, 4, and 8 was $4,450.

The basis of each lot sold as set forth in the notice of deficiency (as distinguished from the basis of improvements on the improved lots) should be increased by the amount of $33.76, in accordance with the stipulation of the parties.

During the year 1954, petitioners sold the following unimproved lots in five transactions. Said lots had the following sales price and cost basis:

| Sales price | | Cost basis | |
|---|---|---|---|
| Total | $9,250 | Lots 3 | $1,228.04 |
| | | 7 | 424.12 |
| | | 13 and 14 | 759.63 |
| | | 30 and 31 | 759.63 |
| | | 42 | 346.44 |
| | | | [1] 236.32 |
| | | Total | 3,754.18 |

[1] Addition of $33.76 to each lot per stipulations.

In addition to the sale of unimproved lots in 1954, petitioners built and sold in that year four houses located on various lots in the tract, as follows:

| Lot involved (numbered) | Cost basis—lots, notice of deficiency |
|---|---|
| 16 | $361.99 |
| 17 | 361.99 |
| 20 | 361.99 |
| 21 | 361.99 |

The basis of each lot sold (as distinguished from the basis of the improvements thereon) should be increased by the amount of $33.76 over the basis set forth in the notice of deficiency in accordance with the stipulation of the parties. The sales price allocable to these improved lots (as distinguished from the sales price of the improvements thereon) was as follows: Lot 16, $1,250; lot 17, $1,250; lot 20, $1,250; lot 21, $1,500.

On the sale of improved lots, there was no separation of the sales price with respect to the house and lot.

Petitioners did not advertise their unimproved lots for sale, did not pay a commission on the sales thereof, and the purchasers (largely contractors but also homesite buyers) solicited or approached petitioner. Although petitioner O'Donnell Patrick maintained an office in his home, he did not have a separate business telephone in his home, nor did he have a real estate license. The houses built and sold by petitioner O'Donnell Patrick in 1953 and 1954 were sold through real estate agents who received commissions of 3½ per cent.

During the years involved herein, petitioner O'Donnell Patrick did not receive income from any occupation or business other than that received from the building and sale of improved and unimproved lots on the tract. The income from L. S. Ayres & Company shown on the returns for 1953 and 1954 is for petitioner Elizabeth Patrick.

Petitioner continued to build and sell improved and unimproved lots from the tract during the years 1955 and 1956.

During the years in issue, petitioner O'Donnell Patrick handled the financing for the houses built, superintended construction (although subcontracting a great deal of the work), arranged for subcontractors, procured materials, and, in general, did about everything a contractor would do. He also handled the transactions for the sale of both improved and unimproved lots. He maintained an office at his residence where he kept books and files.

During the years 1953 and 1954, the improved and unimproved properties sold were held primarily for sale to customers in the ordinary course of business carried on in said years by petitioner O'Donnell Patrick.

OPINION.

The primary issue presented is whether or not respondent was correct in determining that the profits from the sale of improved and unimproved lots were to be taxed as ordinary income upon the principle that such lots were, in the years and at the time of sale, held primarily for sale to customers in the ordinary course of business within the meaning of sections 117(a)(1)(A) and 117(j) of the Code of 1939 (with respect to sales in 1953), and sections 1221(1) and 1231(b)(1)(B) of the Code of 1954 (with respect to sales in 1954). The several Code provisions are identical in language insofar as here material. Petitioners argue that such profits are entitled to long-term capital gains treatment under the same sections.

The problem of whether sales of lots, whether improved or unimproved, were held primarily for sale to customers in the ordinary course of business has been considered by the courts on numerous occasions. In many instances, criteria have been mentioned which may have weight in resolving the issue in the particular case. Criteria which may be significant in some settings are of little if any aid in others. All of the cases agree that the issue is primarily one of fact under all of the circumstances of the particular case, and that no single factor is likely to be controlling. In our judgment, a review of the authorities would unduly extend this opinion and would serve no useful purpose here. We confine ourselves to a discussion of the evidence before us in the instant case, the factors which emerge therefrom, and the arguments in relation thereto as advanced on behalf of the parties.

Petitioner testified, in part, that he and his wife purchased the original tract of 37 acres in July 1950 intending to hold it as an investment, and also to build a home for themselves on it; that he farmed about 10 acres of it (in a part of the tract removed from the lots ultimately sold) in 1951 and 1952; and that (prior to 1953) he made two efforts to sell the tract as a whole. We believe this testimony, and we recognize that if the property had retained its character as investment property, the profits arising from sale in liquidation of the investment would be entitled to capital gains treatment. We think it clear, however, that this is not what actually occurred.

In 1952, petitioner discussed with a contractor the building of a home on the tract for himself and wife. The contractor "sold" him the idea of building about 100 houses on various lots and selling the houses and the lots on which they were built. At least a general understanding was reached, and in the same year, the building of two

houses was begun. After they were 40 to 50 per cent complete, petitioner and the contractor had a falling out, and petitioner decided to go on with the project himself. He completed and sold the two houses (together with the lots on which they were built) in 1952. While the precise date in 1952 cannot be determined from the record, we think it evident that petitioner, in 1952, embarked upon a business enterprise, namely, the building of houses, and the sale of the houses together with the lots on which they were built. This enterprise continued through 1953 and 1954 (the years in issue) and on at least into 1955 and 1956. Petitioner, during 1953 and 1954, devoted most of his time to the building of houses, and such time as was required to consummate transactions for the sale of such improved lots. The actual procurement of purchasers was handled through real estate agents who received 3½ per cent commission on such sales. The record is bare of any evidence of whether or not the real estate agents advertised the properties to be sold, but it is clear that the sales of such improved properties were effected by such agents. Petitioner had no occupation in 1953 or 1954 except with respect to the building of houses, the sale of the improved lots through agents employed by him, and the sale of unimproved lots (to be discussed *infra*). Petitioner, during this period, superintended construction, handled finances, made arrangements with subcontractors, procured materials, and did about "everything a contractor would do." He had previously had the lots marked out by a survey and had put in a gravel road on 67th Street and a drainage ditch.

Petitioner recognizes, on brief, that he is not entitled to capital gains treatment on the houses sold, and agrees that he was in the business of building houses for sale but argues that the very lots on which the houses were built are entitled to different, i.e., capital gains, treatment on the basis of allocated costs and selling prices. The lots and the houses, however, were sold as one, and the improved lots were just as much devoted to the overall activities of petitioner's business as the houses which were built upon such lots. The business enterprise encompassed both. We think there is no merit in petitioner's contention in this respect, and we find no authority to support it. We add for completeness that there is no evidence of any intention to retain the lots with houses for rental purposes.

Petitioner also maintains that the profits on sales of unimproved lots in 1953 and 1954 are entitled to capital gains treatment. Here he points to the fact that he did not advertise, solicit sales, employ real estate agents to sell, or push the sales of such lots in any way. He also states that the sale of such lots took little of his time.

It is true that petitioner's basic plan was to build first and then sell house and lot as one. On the other hand, it is apparent that disposition of the lots, from the outset of his business undertaking, was part of his general plan of business activity, awaiting only the time and opportunity to build houses on them. It is evident that when he began to build houses, contractors operating in the area, seeking sites for home building, and some who desired to be homeowners, became aware of the fact that lots were available. Advertising and soliciting were unnecessary because the prospects sought out petitioner. There is no suggestion in the record that he was unwilling to sell unimproved lots, and there is every indication that he did sell them whenever he received a satisfactory offer. We think that the unimproved lots were held as an integral part of his business plan and that the circumstances of their sale show that at the various dates of sale their disposition had become a part of the active conduct of his business. Clearly such sales were not a part of the liquidation of an investment.

Petitioner emphasizes the fact that he was not a licensed real estate broker or dealer. There is no suggestion in the record, however, that he was engaged in selling real estate for others on a commission basis, or any showing that a license was required for him to sell houses or lots or both when the properties sold were owned by himself and his wife, or that he was any the less engaged in the business of selling unimproved lots or selling lots improved by houses built by him.

We have carefully examined all of the cases referred to in the briefs and we find them so clearly distinguishable from the instant case, on the facts, that a case by case analysis would serve no useful purpose.

As already indicated, we conclude that both the lots improved by houses and the unimproved lots sold in 1953 and 1954 were in those years primarily held for sale to customers in the ordinary course of the business carried on by O'Donnell Patrick, and we sustain respondent subject to conceded adjustments which will be reflected in the Rule 50 decision.

It is apparent that the issues relating to self-employment taxes in 1953 and 1954, and additions to tax for 1954 under section 294(d)(2) are disposed of by our holding in relation to the primary issue of whether or not the gains from the sale of improved and unimproved lots are to be treated as ordinary income, and, subject to conceded adjustments, will be reflected in the Rule 50 decision.

*Decision will be entered under Rule 50.*