Charles L. Tidwell and Corinne S. Tidwell v. Commissioner.
Tidwell v. Commissioner
Docket No. 71019.
United States Tax Court
T.C. Memo 1961-162; 1961 Tax Ct. Memo LEXIS 194; 20 T.C.M. (CCH) 810; T.C.M. (RIA) 61162; May 31, 1961
*194 1. In 1953 and 1954, petitioner Charles L. Tidwell and another, both full-time executives of a milling company, purchased two unimproved, contiguous tracts of land adjacent to the village formerly owned by the company. Immediately after acquiring the second tract, they had the two tracts subdivided and had streets cut through the property and graded. The subdivided property was turned over to real estate agents for sale. In 1955, 15 lots were sold and by 1960, 38 of the 68 lots had been sold. Held, property was held by petitioner in 1955 primarily for sale to customers in the ordinary course of his trade or business and the gain from the sale of lots was ordinary income. 2. Held, petitioners failed to prove that they are entitled to deduct as expense of operating an automobile used by Charles for both business and pleasure any amount in excess of the amount Charles was reimbursed by his employer for business use of the automobile.
3. The cost of digging a well and installing a water pump on rental property was a capital expenditure and not deductible as rental expense in the year 1955. Wesley M. Walker, Esq., for the petitioners. James E. Johnson, Jr., Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1955 in the amount of $1,661.67. The issues for decision are: (1) Whether the gain realized by petitioner Charles L. Tidwell (sometimes hereinafter referred to as Charles) in 1955 from the sale of lots in *196 a subdivision called Kirkwood Heights is to be considered as gain from the sale of capital assets or as ordinary income; (2) whether petitioners are entitled to a deduction for an amount representing the expense of operating an automobile in 1955, in excess of reimbursement received from Charles' employer, and if so, the amount of such deduction; and (3) whether petitioners are entitled to a deduction for the cost of a well and water pump dug and installed on rental property in 1955. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners were husband and wife and resided in Greenville, South Carolina, during the year 1955. They filed a joint Federal income tax return for the year 1955 with the director of internal revenue for the district of South Carolina, and reported their income on the basis of a calendar year and by the cash method of accounting, except for certain sales of lots here in controversy reported on the installment basis. During the year 1955, Charles was employed in an executive capacity as manager of Dunean Mill, located in Greenville, South Carolina, and as manager of Watts Mill, located in Laurens, South Carolina, *197 which mills were branches of J. P. Stevens & Company, Inc. (hereinafter referred to as Stevens), textile manufacturers. Charles had been employed by Stevens since 1941 and had been manager of the Dunean and Watts Mills since 1950. Charles and W. K. Stringfellow (hereinafter referred to as Stringfellow), who was also employed by Stevens in an executive capacity, purchased jointly 4.24 acres of land (hereinafter referred to as "the first tract") for $5,175 on September 21, 1953, from Stevens. On July 20, 1954, Charles and Stringfellow purchased 19.69 acres of land (hereinafter referred to as "the second tract") for $20,000 from Stevens. The first and second tracts were contiguous and were on the outskirts of Dunean Mill Village, consisting of some 574 houses originally owned by the company near the Dunean Mill, and were near other residential properties. These company houses (with two exceptions) had been sold by Stevens in 1950 to employees of the mill. The tracts were about three city-blocks from Charles' office at Dunean Mill. There had been a trend in the textile industry for companies to sell their company houses and other real estate. Stevens had sold its company houses *198 pursuant to a general program directed by its management, and Charles, noting Stevens' program to sell first its company houses and then its other real estate, asked the vice president of Stevens to give him and Stringfellow (who at that time was head of the cost division for eight of Stevens' mills) first choice with respect to the first and second tracts, if Stevens decided to sell. Charles and Stringfellow were in a position to know whether particular property was for sale by Stevens. Charles and Stringfellow took title to both tracts subject to the restriction "that no mercantile establishment shall be erected, operated or maintained thereon." When they bought the first tract, they were not able to buy the second; Stevens would not sell the second tract at that time. However, while they had no assurance that Stevens would ever sell them the second tract, they hoped that Stevens would do so. Charles and Stringfellow paid cash for both tracts, each contributing one-half of the purchase price for each tract. Charles did not borrow any money to pay for his one-half interest in the first tract; he borrowed $10,000 to purchase his interest in the second tract and used as security *199 for the loan property other than the real estate. Soon after acquiring the second tract, Charles and Stringfellow employed an engineering firm to make a survey of the tracts and discussed with the firm the general location of the lots on a plat to be prepared by the engineers. On August 5, 1954, the preliminary survey of the tracts was completed. Charles and Stringfellow had not tried to sell any of the property prior to the survey. On November 2, 1954, the subdivision was approved by the Greenville Planning and Zoning Commission. The approval was obtained by the engineering firm which Charles employed to plat the two tracts, and Charles did not appear before the Commission. Under date of November 19, 1954, Charles wrote Smith & Fox, realtors in Greenville, South Carolina, the following letter: Gentlemen: Mr. Stringfellow and the writer have given considerable thought as to the pricing of the various lots located in Kirkwood Heights. Realizing this piece of property is valuable, and after checking the area, we believe that the prices that we are giving you are in line and are prices that we would like to start off with. At a later date if these prices seem to be out of *200 line and things do not seem to be moving as they should, we will meet with you and discuss this further. Lot #
Price
2
$2350
4
2350
6
2350
9
2350
10
2050
13
1950
14
1525
15
1575
19
2200
21
2200
23
2250
25
2350
27
$2175
29
2200
31
2000
33
2050
35
1525
39
1750
42
1695
43
1600
49
1350
50
1275
51
1150
53
1400
Should there be any further questions, please do not hesitate to call us. Very truly yours, /s/ Chas. L. Tidwell Chas. L. Tidwell After taking bids for cutting and grading roads into Kirkwood Heights and for digging a drainage ditch through the property, Charles and Stringfellow selected a contractor who did this work for them. When the roads were graded, Charles and Stringfellow deeded them to Greenville County which surface-treated them. On January 31, 1955, Charles and Stringfellow, as "Owners," and H. C. Smith and C. S. Fox (hereinafter referred to as Smith and Fox), as "Agents, entered into the following agreement: AGREEMENT This agreement between C. L. Tidwell and W. K. Stringfellow, hereinafter called OWNERS, and H. C. Smith and C. S. Fox, hereinafter called AGENTS, WITNESSETH: (1) That the owners *201 agree to complete or have completed the subdivision of a tract of land shown on a preliminary plat of "Kirkwood Heights" made by Pickell and Pickell on August 5, 1954, including the completion of the survey and the preparation of a plat, the marking of the lot corners with stakes, the designation of the lot numbers by appropriate markers on the ground, the locating and finishing of roads, drainage ditches and pipes. (2) The agents shall have, for a period of three years from the date of this contract, the exclusive right to sell as agents or brokers as many of the lots shown on the said plat or any revision thereof as the owners may offer for sale. (3) It is agreed that the owners have reserved ten lots which have been designated by them that they may dispose of in any way they see fit. It is further agreed that the agents are authorized to sell the 24 lots marked on the plat during the year 1955; thereafter the owners will designate at the beginning of each year which lots, if any, are to be sold during each calendar year. (4) The prices and terms upon which the said lots shall be sold shall be determined by the owners from time to time. (5) The agents agree to handle all *202 collections on lots sold on terms and to keep adequate records and remit to the owners at such times as may be agreed upon, without additional cost to the owners. (6) The agents agree to devote sufficient time and attention to the promotion of the subdivision, to reasonably sell said lots, and to obtain and pay for such advertising and promotion as may be reasonably necessary for the sale of said lots. (7) The agents agree to serve without compensation as members of the building committee to pass upon proposed construction in accordance with the building restrictions to be prepared. (8) The owners agree to pay to the agents a commission equivalent to ten (10%) per cent of the sales price of such lots as are sold; said commission shall be paid in full upon collection of fifty (50%) per cent of the agreed sales price, and shall constitute all compensation to the agents for all service rendered pursuant to this contract. (9) The owners agree to pay the legal fees for the preparation of deeds and the cost of the stamps thereon for all lots sold. IN WITNESS WHEREOF, we have hereunto set our hands and seals in quadruplicate this 31st day of January, A.D. 1955. OWNERS: /s/ Chas. *203 L. Tidwell (SEAL), C. L. Tidwell IN THE PRESENCE OF: /s/ W. K. Stringfellow (SEAL), W. K. Stringfellow /s/ Jo Ann Glenn /s/ Allen T. Adams AGENTS: /s/ H. C. Smith (SEAL), H. C. Smith /s/ C. S. Fox (SEAL), C. S. Fox When this agreement was signed, streets had been graded and lots had been designated. Charles and Stringfellow paid $1,963 for the plat of the tracts prepared by the engineering firm which they employed. The grading of streets and digging of drainage ditches cost Charles and Stringfellow $3,924. No other grading or excavating work was done, and no sidewalks, curbs, or gutters were built by Charles and Stringfellow. Sewage service and water for the tracts were supplied by Parker Water & Sewage District at no cost to the owners. Charles arranged for this water and sewage work. Charles and Stringfellow shared the engineering and grading costs of the tracts equally. The subdivision formed from the two tracts was called Kirkwood Heights, "Kirkwood" being Stringfellow's name. The subdivision had been named by the time Charles approached Smith and Fox. Smith and Fox handled the advertising of the lots for sale. This advertising consisted of a billboard sign *204 costing about $60 and several advertisements in the newspapers, but Smith and Fox, not having much pressure from Charles and Stringfellow to sell the lots, did not "push" the sales. In 1955, 15 lots in the subdivision were sold: 7 for cash, and 8 on the installment basis. In 1956, 4 lots were sold. By March 1960, 38 lots had been sold out of a total number of 68. Charles did not handle sales of the lots except for one lot sold to a church of which Charles was a member. Otherwise, sales were made by Smith and Fox. If anyone approached Charles about buying lots, he referred him to Smith and Fox. Prices of the lots were fixed by negotiations, but final authorization for prices came from Charles. Smith and Fox checked restrictive covenants regarding the lots with Charles and Stringfellow. These restrictions pertained to the size of houses to be built on the lots. The sizes of the houses ranged from 900 to 1,200 square feet, with a few lots for duplex houses. Payments for lots sold on the installment basis were collected by Smith and Fox, as was the interest which was charged on unpaid balances. Smith and Fox made accounting for these receipts to Charles and Stringfellow. On *205 their 1955 return, petitioners reported the following gain from the sale of 15 lots in Kirkwood Heights subdivision in 1955: Selling
Description
Price
Cost
Gain
Expense
Reported
Lots #1, 2, 4, 10, 19, 22, & 31
$15,125
$3,823
$11,302
$1,482.55
$ 9,819.45
Installment Basis Sales
Lot #6 (10% pd.)
2,350
595
1,755
175.50
10 (10% pd.)
2,050
519
1,531
153.10
Lot #21 (19.09% pd.)
$ 2,200
$ 557
$ 1,643
$ 313.65
26 (19.96% pd.)
2,350
595
1,755
350.30
27 (19.19% pd.)
2,175
551
1,624
311.65
29 (14.54% pd.)
2,200
557
1,643
238.89
30 (19.52% pd.)
2,100
532
1,568
306.07
33 (10% pd.)
2,050
519
1,531
153.10
Total
$32,600
$8,248
$24,352
$1,482 $55
$11,821.71 They reported that they were entitled to one-half of the foregoing gain or the amount of $5,910.86, which they reported as long-term capital gain. Respondent determined that the $5,910.86 gain was ordinary income. In 1955, Charles owned a 1955 Ford and 1955 Buick. He used the Buick to drive to and from his house and his office at Dunean Mill, which was only a block from his house. He also used the Buick about twice a week to drive to and from *206 Watts Mill of which he was manager. The Watts Mill was about 37 miles from the Dunean Mill. He used the Buick for personal travel as well as for company business. He was entitled to 8 cents per mile from Stevens for the use of his car for company business. On their 1955 return, petitioners deducted the following as an itemized deduction: Business automobile expense
1955 Buick cost $3,716 at 25 per-
cent
$ 929.00
Gas, oil, and upkeep
468.10
$1,397.10
Less 5,761 miles at 8 cents re-
imbursed
477.68
Amount deducted:
$ 919.42
No expense of operating the Ford is included in the foregoing amounts, but the amount of $468.10 represents Charles' estimate of the total amount for upkeep of the Buick in 1955. Respondent disallowed the entire amount claimed as a deduction. Charles owned two houses about 5 miles outside of Greenville which he rented. These houses were situated beside each other and were served by a single well. In August 1955, Charles sold one house situated on the lot on which the well was located. The cost of this well was added to the basis of the property sold in computing petitioners' gain on the sale as reported on their 1955 return. After *207 Charles sold the first house, he had a well dug and a water pump installed to serve the second house at a cost of $440.49, which amount petitioners deducted as a rental expense on their 1955 return. Respondent disallowed the deduction. Charles' interests in the lots in Kirkwood Heights sold in 1955 were held by him primarily for sale to customers in the ordinary course of his trade or business. Opinion The first issue is whether Charles held his one-half interest in Kirkwood Heights subdivision in 1955 primarily for sale to customers in the ordinary course of his trade or business. If he did, section 1221 of the 1954 Code would exclude his interest in the lots sold in that year from the classification of capital assets and petitioners would thereby be denied capital gains treatment on the profits realized from the sale of the 15 lots. The issue is basically factual, Dougherty v. Commissioner, 216 F. 2d 110 (C.A. 6, 1954), affirming per curiam a Memorandum Opinion of this Court; Wellesley A. Ayling, 32 T.C. 704 (1959); Raymond Bauschard, 31 T.C. 910 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960), and our ultimate finding of fact *208 that he did disposes of this issue. [1]
In resolving this issue, which must depend in the final analysis on the particular facts of each case, some of the principal factors given consideration by the courts have been the purposes or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales-related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. W. T. Thrift, Sr., 15 T.C. 366 (1950); Boomhower v. United States, 74 F. Supp. 997 (N. D. Iowa 1947). However, the presence or absence of any of these factors is not controlling and the various factors may be accorded different weight according to the circumstances of the case. The basic question is - were the taxpayers in the business of subdividing and selling real estate? The taxpayer's purpose in originally acquiring the *209 property is important evidence bearing on the question, although it is not conclusive. The crucial question is the reason for holding the property at the time of sale. Bauschard v. Commissioner, 279 F. 2d 115 (C.A. 6, 1960), affirming 31 T.C. 910 (1959); Mauldin v. Commissioner, 195 F. 2d 714 (C.A. 10, 1952), affirming 16 T.C. 698 (1951); O'Donnell Patrick, 31 T.C. 1175 (1959), affd. 275 F. 2d 437 (C.A. 7, 1960); and Charles E. Reithmeyer, 26 T.C. 804 (1956). However, in this case, it seems clear that Charles intended to subdivide the tracts and sell lots when he and Stringfellow bought the properties and was carrying out that purpose when the lots were sold in 1955. We do not have the benefit of any testimony by Stringfellow, and Charles' testimony as to his reasons for buying the tracts is merely generalized and to the effect that he bought them for "investment." In the context of his entire testimony, Charles' statement is ambiguous. The facts are that Charles and Stringfellow took steps to subdivide the tracts, cut roads, have the subdivision approved by the zoning commission, obtain *210 water and sewage service for their lots, and arrange with real estate agents to advertise the subdivision and to get buyers for the lots. Furthermore, these steps were taken immediately after Charles and Stringfellow bought the second tract. If by his statement that he bought the tracts for investment Charles meant that he contemplated resale at a profit, it seems obvious that he intended resale of the tracts by lots after platting and subdivision and that the profit would result from the platting and subdivision. There is no evidence that he intended to hold the property until it increased in value, or that he anticipated sale of the properties as a single tract. Cf. Wellesley A. Ayling, supra.The facts indicate the contrary. Admittedly, he did not attempt to sell the properties in a single transaction but subdivided the properties and started selling lots immediately after acquiring the second tract. Nowhere in his testimony is to be found any means by which Charles expected to realize a profit on his "investment" in the properties except in the manner in which he actually did; that is, by frequent and continuing sales of lots to the public. But even if it be conceded *211 that Charles bought his interest in the tracts for investment and strictly as a passive investor, that purpose was altered by the year 1955 when the lots were sold. It is settled that a taxpayer's purpose in holding property can be different from his purpose in acquiring the property. See, e.g., Eline Realty Co., 35 T.C. 1 (1960). The facts show beyond argument that Charles held his interest in the lots in Kirkwood Heights in 1955 primarily for sale to customers, regardless of what may have motivated his purchase of the interests in the tracts in 1953 and 1954, and we believe compel the conclusion that this constituted a trade or business in which Charles was engaged in 1955 within the meaning of section 1221(1). True, Charles borrowed $10,000 to finance the purchase of his interest in the second tract in 1954, and he testified that the reason he sold his interests in the 15 lots in 1955 was in order to repay this loan. But there is no indication in the record that he would not have begun selling lots had there been no loan to repay, or that the proceeds from the sales of Charles' interests were actually used to repay the loan, and it is admitted that the sales of lots *212 continued from 1955 to 1960 when more than one-half of the lots had been sold. Furthermore, Charles did not secure the loan by a mortgage on the property, which would have created some difficulty in selling single lots. It is more consistent with Charles' testimony to conclude that the $10,000 loan financed his purchase of the tracts for the express purpose of subdivision and public sale of lots than to conclude that the loan financed a passive investment. To show that Charles was not in the business of selling his interests in the lots in 1955, petitioners argue that he did not use his office at the mill for handling sales; that he was a full-time employee of Stevens; that he devoted little time to the matters of having the tracts subdivided, having the subdivision approved by the zoning commission, getting roads graded, obtaining water and sewage service, and arriving at prices and restrictions for each lot (which matters Charles and not Smith and Fox had to decide finally); and that he personally handled negotiations for the sale of only one lot in 1955. But it is not necessary that the trade or business of selling residential lots be the taxpayer's only business, or even his *213 principal one, William E. Starke, 35 T.C. 18 (1960), or that the taxpayer conduct the real estate activities individually rather than through agents. Bauschard v. Commissioner, supra; Achong v. Commissioner, 246 F. 2d 445 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court. Charles did or had done everything that was necessary to subdivide and prepare the tracts for sale as residential lots; it appears only fortuitous that no more time and effort was required in the matters of securing water and sewage service and zoning approval. The activities of the engineering firm in getting approval of the zoning commission (the extent of which activities is not detailed in the record) and of Smith and Fox in advertising the subdivision and getting customers for the lots are to be imputed to Charles and Stringfellow. These firms were the owners' agents; they were not doing these things in their own behalf as a part of their own businesses. Cf. James Lewis Caldwell McFaddin, 2 T.C. 395 (1943), modified on other grounds 148 F. 2d 570 (C.A. 5, 1945). Based on the evidence presented, we believe Charles' interests in the *214 lots sold in 1955 fall within the exclusion provided by section 1221(1) of the 1954 Code, and were not capital assets. Accordingly, petitioners' gain from such sales, the amount of which gain is not here in dispute, constituted ordinary income to them in 1955. As for the deduction which petitioners claim for operating the Buick automobile as a business car in 1955, respondent has determined that petitioners are not entitled to any deduction since Charles' expenses of operating the car on business did not exceed the amount he was reimbursed by his employer for business travel. Charles' testimony on this point is indefinite, but admits that he used the Buick for commuting and for other personal purposes in 1955 and that his estimate of the expenses of operating the Buick which appears on their 1955 return represented the total cost of operating the Buick in 1955. That is, petitioners made no attempt to allocate the total costs as between business and personal uses on their return, and they offered no such allocation at the trial. Petitioners' burden of proving that the costs of operating the car exceeded the allowable amount as determined by respondent is clear, and petitioners have *215 not discharged that burden. The record contains no basis for upsetting respondent's determination and respondent is sustained on this issue. With respect to the third issue, petitioners claim a deduction in the amount of $440.49, representing the cost of digging a well and installing a water pump in 1955. Charles sold one of his rental houses in 1955 and his remaining house was without water after this sale, so he had a well dug and a water pump installed to serve the remaining house. The cost of the original well was capitalized and added to the basis of the house which was sold in 1955. Respondent has determined that the cost of the well dug in 1955 should also be considered a capital expenditure, and that no deduction for the expense is allowable in 1955. Section 263(a)(1) of the 1954 Code would disallow the deduction if the cost of the new well represented an amount paid out for permanent improvements or betterments made to increase the value of the property. Of course, a well would ordinarily be in the nature of a permanent improvement to rental property, and it and the water pump would have a useful life substantially in excess of the taxable year. See (A)-2 (A)-2 sec. 1.263 (a)-2, Income Tax Regs. *216 There is no evidence here to indicate this well and water pump were anything to the contrary. The well and water pump can hardly be considered as incidental repairs and costs of maintenance. They are capital items the cost of which should be recovered through an allowance for depreciation. This issue must also be decided for respondent. [2]
Decision will be entered for the respondent. Footnotes
1. The subdivided lots were neither inherited nor held by the taxpayer for a period of 5 years, so section 1237 of the 1954 Code does not apply.↩
2. It does not appear that respondent allowed any deduction for depreciation on the well and water pump in his notice of deficiency. However, this was not assigned as error in the petition nor is there any evidence in the record regarding the date when the well and water pump were installed or regarding their useful lives.↩