Alma R. Lockwood and Ralph J. Lockwood v. Commissioner.
Lockwood v. Commissioner
Docket No. 86237.
United States Tax Court
T.C. Memo 1962-278; 1962 Tax Ct. Memo LEXIS 29; 21 T.C.M. (CCH) 1470; T.C.M. (RIA) 62278; November 26, 1962
*29 Held: Amount paid by petitioner in 1956 to X pursuant to a prior agreement to indemnify X for all losses incurred because of X's advances to a corporation upon the corporation's bankruptcy, such agreement made in consideration of X giving petitioner one-half of the corporation's stock, constituted a capital loss on the worthlessness of securities rather than a bad debt or business loss. Held, further: That the unimproved lots sold in 1956 were, in the year in which such sales were made, held primarily for sale to customers in the ordinary course of business, and the profits therefrom are not entitled to capital gains treatment. Ralph J. Lockwood, Esq., 115 Balmoforth St., Bridgeport, Conn., for the petitioners. Lawrence A. Wright, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1956 in the amount of $6,212.55. The only issues before us are: (1) Whether petitioner is entitled to a worthless bad debt deduction for that year and, if so, whether as a business or nonbusiness debt; and (2) whether income realized by petitioner from the sale of real estate during that *30 year should be taxed as ordinary income or capital gains. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Ralph J. Lockwood (hereinafter sometimes referred to as petitioner) and Alma R. Lockwood are husband and wife residing in Bridgeport, Connecticut. Petitioners filed their joint Federal income tax return for the taxable year 1956 with the district director of internal revenue for Connecticut. Issue I In 1937 petitioner organized the United States Finance Corporation of Bridgeport, Connecticut, for which he acted as secretary and general manager. Upon petitioner's admittance to the bar in 1947, he resigned as general manager of the finance company but continued as secretary and became its attorney, setting up his law office in the same suite as that occupied by the finance company. During this period of close association with the finance company he learned of special business opportunities. In 1951 petitioner came into contact with Mechaneers, Inc., a corporation needing assistance in its finance operations. Petitioner became treasurer of the corporation and spent much of his time in that business and guaranteed some of its *31 indebtedness and borrowings to permit it to get credit. For his efforts on behalf of that corporation, petitioner received a salary and stock. In the latter part of 1952, petitioner sold his stock and resigned from his position with the corporation. In early 1953, petitioner helped Park City Electronic Laboratory, Inc., by acting as its financial advisor and by guaranteeing some of its indebtedness. As compensation he received shares of stock in that company. In 1955, petitioner organized and became one of four partners in Business Finance Company, which was organized to lend money secured by chattel mortgages, factors liens, accounts receivable and real estate mortgages. Petitioner advanced no money to such company, receiving his one-fourth interest in consideration for his agreement to absorb one-fourth of any losses of the company. From 1899 until 1956 The American Bobbin Company (hereinafter referred to as Bobbin), a Maine corporation with its principal place of business in Lewiston, Maine, had been engaged in the manufacture of spools or bobbins for textile mills. In 1955 all of the outstanding stock of the corporation was owned by LaSalle Industries of Maine, which stock was *32 owned or controlled by Kalman Greenhill. During 1955, Greenhill retained petitioner to help with the financing of Bobbin. Greenhill has serious financial difficulties concerning other business ventures for which he had been borrowing money from Bobbin. In December 1955, Greenhill, through the assistance of petitioner, obtained a $10,000 loan for Bobbin from Allan Dubin, one of petitioner's partners in the Business Finance Company. This loan was subsequently repaid by Bobbin. Shortly thereafter petitioner, Greenhill and G. Milton Hutchinson, president of Bobbin, met in New York to discuss Bobbin's financial situation. Hutchinson told petitioner that the company would have to close unless additional funds were obtained immediately. Greenhill told petitioner that he believed he would be able to obtain sufficient funds by March 10, 1956, to adequately finance Bobbin. Petitioner advised Greenhill that he might be able to obtain advances of between $15,000 and $25,000. Greenhill then submitted a profit and loss statement showing the net profit of Bobbin for the year ended December 31, 1955, to be $3,536.69, and a balance sheet summarized as follows: American Bobbin Company
Balance Sheet
December 31, 1955
ASSETS
Current assets
$ 76,906.35
Machinery & Equipment (net after
depreciation)
27,085.70
Other assets
95,393.10
Total assets
$199,385.15
LIABILITIES
Current liabilities
$133,622.82
Other liabilities
9,077.18
Capital stock
5,000.00
Earned surplus
51,685.15
Total liabilities and net worth
$199,385.15
*33 The "other assets" of $95,393.10 was composed of loans made by Bobbin to other business ventures of Greenhill. Petitioner was impressed with Bobbin's potential, especially if the drain of money on it by Greenhill was stopped, and discussed the situation with Samuel Paushter, an attorney, who was sharing offices with petitioner and the finance company in Connecticut. It was agreed between them that Paushter would advance not less than $20,000 to Bobbin, and petitioner would indemnify Paushter for one-half of his losses in return for petitioner receiving one-half of the profits of the transaction. Pursuant to such discussion, and further discussions with Greenhill and Hutchinson, an agreement was entered into between Greenhill and Paushter on February 8, 1956, which stated, in part, as follows: AGREEMENT This agreement made this 8th day of February 1956 between KALMAN GREENHILL, of the Borough of Manhattan, City of New York and State of New York, hereinafter referred to as the SELLER, and SAMUEL PAUSHTER of the City of Bridgeport, County of Fairfield and State of Connecticut, hereinafter referred to as the BUYER. WITNESSETH: Whereas the SELLER is the owner of all of the shares of issued *34 stock of all classes of La Salle Industries, Inc., a New York corporation, and Whereas La Salle Industries, Inc., is the owner of all of the shares of issued stock of all classes of La Salle of Maine, Inc., a Maine corporation, and Whereas La Salle of Maine, Inc., is the owner of all of the shares of issued stock of all classes of American Bobbin Company, a Maine corporation, and Whereas SELLER wishes to sell all of said stock of American Bobbin Company to BUYER on the terms and conditions hereinafter set forth, and Whereas BUYER wishes to buy all of said American Bobbin Company stock from SELLER on the terms and conditions hereinafter set forth, and Whereas all of said stock of American Bobbin Company has been pledged with Morris Back, of the City of New York, as security for a loan on which the balance due is a sum not in excess of $2,500.00, Now, therefore, in consideration of the mutual promises, covenants, and agreements herein contained, the parties do hereby agree as follows: 1. The SELLER herewith sells to the BUYER, who agrees to buy, all of the issued stock of all classes of American Bobbin Company, a Maine corporation, which consists of ten (10) shares of common stock of *35 said corporation. 2. The parties agree that said shares of stock shall be, and they hereby are, delivered to Ralph J. Lockwood, Esq., of the aforesaid Bridgeport, who agrees to hold them in escrow until March 10, 1956 at 5:00 P.M. as hereinafter set forth in Paragraph 7. * * *
4. As and for the purchase price for said stock, Paushter agrees to: (a) Pay to Morris Back such sums as may be due him for the release of the pledged stock, but in no event a sum larger than $2,500.00, by endorsing a note from American Bobbin Company to Back in the sum of $2,500.00; * * * (b) Secure on said note the additional endorsement of Ralph J. Lockwood, Esq. (c) Loan to Bobbin as it may from time to time request in writing, a total sum of not less than $10,000.00, but as much more than $10,000.00 as the aforesaid Paushter may, in his sole discretion and judgment, deem proper. * * * (d) Cause Bobbin to retain Kalman Greenhill, Esq., of New York City as consultant counsel for a fifty (50) consecutive week period commencing September 1, 1956 and expiring August 15, 1957, for a total sum of $5,000.00, payable at the rate of $100.00 each week, with the first payment due on September 7, 1956. * * * (e) Continue *36 the management of Bobbin under its president, G. Milton Hutchinson, until at least March 10, 1956. * * *
7. On or before March 10, 1956 as part consideration for this agreement, SELLER may repurchase from BUYER all of the Bobbin stock hereinbefore sold by SELLER to BUYER, upon fulfilling the following terms and conditions: (a) Paying in full or otherwise refinancing the balance then due on the Back note so that Paushter and Lockwood are removed as endorsers. (b) Pay to Paushter, in exchange for an assignment of his interest, which assignment Paushter hereby agrees to execute, all monies advanced by Paushter to American Bobbin Company as loans, whether secured or unsecured. (c) Pay to Paushter a sum of $2,500.00 in cash over and above the sums loaned to Bobbin. (d) Until March 10, 1956, SELLER shall continue to receive daily report. It is the intent of the parties that if the SELLER exercises his option as aforesaid, the BUYER be free from all liabilities, primary or secondary, and that the BUYER receive in cash the amount of all monies expended, advanced, or loaned, plus an additional $2,500.00 in cash. (e) All of the above sums due are to be paid over to Ralph J. Lockwood, Esq., as *37 attorney for BUYER, at his office 1188 Main Street, Bridgeport, Connecticut before 5:00 P.M. on March 10, 1956. 8. If the SELLER does not exercise the option set forth in Paragraph 7 herein within the time set forth, then, and in that event, Ralph J. Lockwood is directed to deliver to BUYER all of the Bobbin stock he holds as escrowee, and no restrictions placed on said stock shall be of any force and effect. It is agreed between the parties that this direction to turn over said stock after 5:00 P.M. on March 10, 1956 is irrevocable and that the escrowee is relieved of any responsibility for so doing, and neither party shall have a cause of action against the escrowee for fulfilling the terms of his obligation in accordance with Paragraph 7 herein. * * *
The parties also agreed that Greenhill and his other corporations were not to repay any part of the $95,393.10 owed by them to Bobbin. Pursuant to the above written agreement, Paushter obtained all of the stock of Bobbin. Paushter then caused one-half of the stock to be conveyed to petitioner in exchange for petitioner's promise to indemnify Paushter for one-half of the losses on the loans which Paushter would advance to Bobbin. Subsequently, *38 Paushter and petitioner agreed to give Hutchinson some of their stock in Bobbin, resulting in the three men each owning one-third of the stock. It was agreed that Hutchinson would be general manager and operating head of it, that Paushter would advance money, and petitioner would be liaison for the company with the banks and factors, and be in charge of finance generally. During the period from February through July 1956, petitioner spent a great deal of time working for Bobbin. Paushter during that time made several advances to Bobbin secured by chattel mortgages. During May 1956, upon the refinancing of the company, Paushter and petitioner agreed that the secured indebtedness of Bobbin to Aushter should be subordinated to the indebtedness to the company's principal factor. Around July 1956, the company took inventory. It discovered a large inventory shortage and found that costs were erroneously calculated. As a result, what was thought to be an operating profit was in reality a loss. At such time petitioner and Paushter decided that no more money should be advanced to Bobbin, resulting in the company's adjudication in bankruptcy in December 1956. The unpaid balance on Paushter's *39 advances as of the time of bankruptcy was $37,000, the principal factor, as priority creditor receiving all of the proceeds of the bankruptcy sale. Pursuant to the terms of the indemnity agreement between them, petitioner paid Paushter one-half of his losses on the advances, or $18,500. On Schedule C of his 1956 Federal income tax return, petitioner deducted the amount of $18,500 as a "loss" with the following explanation: Samuel Paushter and I then loaned American Bobbin Co. a total of $37,000.00 secured by a chattel mortgage and factor's lien. American Bobbin Co. was adjudicated a bankrupt in 1956 at U.S. District Court in Maine. 1/2 the money loaned was mine. I lost - Loss ($18,500.00) (the collateral will not cover prior encumbrances). Respondent disallowed the entire $18,500 deduction with the explanation: It has been determined that you are not entitled to a bad debt deduction of $18,500.00 claimed in your tax return for the taxable year 1956, since it has not been established that a debt existed; and, further, that if a debt did exist such amount is not a business bad debt within-the meaning of section 166(a) of the Internal Revenue Code of 1954. Issue II In 1953 petitioner *40 and Jourmire Silverman formed a real estate partnership known as Silverman and Lockwood. The partnership purchased a large tract of land for $42,500, subdivided it into 27 individual building lots and installed roads and storm sewers with a view of erecting homes on such lots for sale. Silverman was to be in charge of building the homes, petitioner was to be in charge of financing and a real estate broker was to sell the homes. During 1954 a model home was built, advertisements were placed in a newspaper and brochures were distributed advertising the development and the homes to be built for sale. As a result, the partnership contracted to build four homes. During 1955, as a result of a disagreement between the partners, the partnership was liquidated, petitioner taking the land and the contracts for the four homes, and Silverman taking the other assets of the partnership. Petitioner then arranged with the Donrich Corporation of Connecticut to build the four homes pursuant to the prior contracts. These four homes were completed during 1956 at a total net loss to petitioner of $3,970.13. About the same time as the homes were completed, petitioner, through a real estate broker, sold *41 14 of the lots for a total price of $56,000. The remainder of the lots were sold in 1961 after petitioner fulfilled the requirements for receiving a building permit for them. On Schedule C (Profit or Loss from Business) of his Federal income tax return for the taxable year 1956, petitioner reported as ordinary business income, a net profit on the sale of these 14 lots in the total amount of $22,521.94, with the following explanation: After it appeared that the houses would make no money I sold the 14 building lots approved for $56,000. The original property laid out into 27 lots which cost: Land
$42,500.00
Engineering
5,475.00
Roads
18,500.00
$56,475.00 *
for a unit cost of
$2,091.29
Net Profit $22,521.94
14 lots cost $29,278.06
During the year 1956 the unimproved properties sold were held primarily for sale to customers in the ordinary course of business carried on in said year by petitioner. Opinion Issue I We think it best, at the outset, to discuss the apparent confusion arising upon consideration of the testimony *42 in relation to the first sentence of paragraph 2 of the Stipulation of Facts, reading as follows: 2. In 1956 Ralph Lockwood, an attorney (hereinafter referred to as petitioner) and one Samuel Paushter advanced in equal shares $37,000 to the American Bobbin Company (hereinafter called the corporation) of Lewiston, Maine. * * *
Whatever terminology may have been used in the stipulation, it is clear from the testimony of Lockwood himself (who was the only witness produced) that any advances made to Bobbin or in connection with the Bobbin transaction in 1956, were made by Paushter; that Paushter acquired all of the stock of Bobbin; and that Paushter sold and transferred one-half of the Bobbin stock to Lockwood in consideration of the latter's agreement to indemnify Paushter to the extent of one-half of any losses Paushter might suffer in the Bobbin venture. At the time the company went into bankruptcy, in 1956, Paushter's unrepaid advances totaled $37,000, and Lockwood, in accordance with his agreement, paid Paushter one-half of such amount or $18,500 in that year. Lockwood stated in court (where he was in the dual capacity of witness and his own counsel) that his testimony was intended *43 to mean the same as the statement in the stipulation. It would follow, conversely, that what was stated in the stipulation is to be construed to mean the same as his testimony. We have no doubt as to the correctness of Lockwood's oral testimony with respect to his relations and agreement with Paushter, which clearly fits into the larger picture, and we accept it as an amplification or explanation of the stipulation. Accepting the foregoing approach, we turn to a consideration of the essential issue. No one questions the fact that Lockwood paid $18,500 to Paushter in 1956 in the Bobbin deal in accordance with their indemnity agreement. Likewise, no one doubts that whatever classification is given to the payment of the $18,500, it was worthless in 1956. While petitioner originally deducted the amount of $18,500 as a business loss, he appears to contend on brief that such amount was a business bad debt. It is axiomatic that one must possess a valid debt before he may deduct a loss thereon, either as a business or nonbusiness bad debt. Here, we think that petitioner errs in his assumption that he possessed a debt in the amount of $18,500 which became worthless in 1956 because such an *44 assumption is contrary to the facts before us. Consistent with the claim of a bad debt deduction, petitioner relies upon the principles expressed in Putnam v. Commissioner, 352 U.S. 82 (1957), which held that a taxpayer paying a corporate debt pursuant to his personal guaranty of such debt may deduct such loss as a business or nonbusiness bad debt. The theory behind such holding is that upon the payment of such debt, the guarantor, by subrogation, steps into the position of the creditor, and continues to hold a debt against the principal debtor. It is the worthlessness of that debt due by the principal debtor, arising by way of subrogation, which is allowable as a bad debt deduction. See Rev. Rul. 60-48, 1960-1 C.B. 112. The instant case does not involve a situation such as that presented in Putnam where the taxpayer was extending his credit to the corporation by personally guaranteeing its indebtedness. Petitioner, in exchange for one-half of the stock of the corporation, agreed to indemnify Paushter for one-half of his losses in connection with his advances to Bobbin. There was never any agreement, express or implied, between petitioner and Bobbin to the effect that petitioner *45 would have any claim against Bobbin in the event he should be required to pay anything to Paushter pursuant to his agreement with Paushter. Upon the facts here presented, no right of subrogation arose in petitioner's favor as a result of his indemnity agreement with Paushter, and no new debt was created. The applicable principle was clearly stated in Howell v. Commissioner, 69 F. 2d 447 (C.A. 7, 1934), affirming 22 B.T.A. 140 (1931), as follows at p. 451: While with respect to suretyship and guaranty, there is an implied obligation of the principal to reimburse the surety or guarantor, a promise to indemnify will not be implied where the guarantor is a mere volunteer and signs without request of the principal, either express or implied. * * * Although the ordinary surety or guarantor is a creditor of the principal debtor, the same cannot be true of an indemnitor who does not undertake to assume or discharge the obligations of another, but has, on his own account, contracted to pay a sum of money upon the occurrence of a certain event, usually the happening or the ascertainment of a loss. There is no privity, either actual or implied, between the promisor in the undertaking the loss *46 from the nonperformance of which is indemnified against and the indemnitor, and the latter, if the loss occurs, does not, by payment of it, discharge any one's obligation but his own. "The indemnitor is liable only to the indemnitee, and his assigns, and, unless he has stipulated for it, he has no remedy over against the party for whose benefit the contract was made." Brandt, Suretyship and Guaranty (3d Ed.) vol. I, p. 20. * * *
The general rule appears to be followed by the State of Connecticut. Reed v. Holcomb, 31 Conn. 360, 363-364 (1863); Wolthausen v. Trimpert, 105 Atl. 687 (Conn. 1919); Grillo v. Cannistraro, 155 A. 2d 919 (Conn. 1959); Paton v. Robinson, 71 Atl. 730 (Conn. 1909). We conclude, therefore, that petitioner upon payment of the $18,500 to Paushter, did not possess a debt which could become worthless since no debt arose by the company to petitioner and none arose by Paushter back to petitioner. Inasmuch as petitioner did not possess a debt in connection with such payment it is elementary that he could not deduct such amount as a business or nonbusiness bad debt. The present case is very similar to that of Albert J. Harvey, Jr., 35 T.C. 108 (1960). In that case *47 the taxpayer owned about one-half of the stock of a corporation. The corporation being in need of money, petitioner requested a friend to personally endorse some of the corporation's indebtedness. In consideration for such endorsement, all of the shareholders, including the taxpayer, conveyed one-half of their shares to the friend. The taxpayer then agreed to indemnify the friend against any loss by reasons of the latter's guaranty of the company's debts. In consideration for this indemnity agreement, the friend assigned to the taxpayer the 50 percent stock interest which he had acquired as consideration for giving his guaranty of the company's debts. Upon the company's bankruptcy the taxpayer paid the amount of $14,300 to his friend because of the latter's obligation to pay such amount pursuant to his guaranty agreement. Holding that the $14,300 represented the basis of the stock received by the taxpayer pursuant to his indemnity agreement, we stated at pp. 112-113: In substance, this transaction constitutes an acquisition of H & O stock by petitioner for his guaranty of the H & O loan. * * *
Petitioner, by his indemnity agreement, assumed a contingent liability and thus acquired *48 the H & O stock without making any immediate payment therefor. Respondent contends that the basis of the stock is $14,300, the net amount which petitioner was required to pay in complete satisfaction of his indemnity obligation, citing D. Bruce Forrester, 4 T.C. 907 (1945). Petitioner makes no contention as to the basis of the stock arguing only that the $14,300 loss here involved is not capital in nature. No evidence has been presented to support any basis for the stock acquired by petitioner for his indemnity agreement other than the amount of $14,300, which he was ultimately required to pay. Respondent concedes that petitioner's H & O stock became worthless in the fiscal year ended July 31, 1955. We, therefore, hold that petitioner in his fiscal year ended July 31, 1955, sustained a capital loss of $14,300 from worthlessness of the H & O stock acquired by him in return for his indemnity agreement. The minor difference in facts between the Harvey case and the instant case, i.e., that the taxpayer agreed to indemnify, in exchange for stock, a guarantor of the company's notes rather than a creditor of the company, does not warrant a differnt conclusion. The net effect of both transactions *49 is that Harvey and petitioner received stock in a corporation based upon their agreement to indemnify the one sustaining a loss upon the corporation's default. The amount they ultimately paid was the consideration for and the basis for their stock. In the light of the foregoing discussion, we hold that petitioner is entitled to deduct the $18,500 payment only as a capital loss in 1956 resulting from worthlessness of stock in that year. While petitioner has not otherwise contended on brief, we may add for completeness that such sum could not be deducted as a business loss under section 165. Assuming, arguendo, that petitioner was in the business of financing companies, we do not believe that the transaction in issue was entered into in connection with such business. In explaining why he entered into the venture with Paushter, petitioner testified, with candor, as follows: Our interest in going into this business was simply it seemed to us with Hutchinson's management in Lewiston, with the money Paushter was going to put into it, with the direction we thought we could give it * * * we could make this a very profitable thing. Hutchinson and I would have an annuity for the rest of our *50 lives. The above testimony refutes any inference that the $18,500 was paid out in connection with petitioner's finance business, and, to the contrary, supports our holding that petitioner's motive was to secure the stock of the company for eventual profits from dividends. Amounts expended to such end are capital in nature and cannot be deemed business losses. Issue II The next question for decision is whether the profit realized by petitioner from the sale of 14 unimproved lots in 1956 is ordinary income or capital gain. Respondent's position is that the lots were not capital assets by reason of section 1221, I.R.C. of 1954, which excludes from the definition of capital assets "property held by the taxpayer for sale to customers in the ordinary course of his trade or business." Petitioner's major contention is that he was never in the business of selling unimproved lots inasmuch as these lots were purchased and held to be used for building thereon and to be sold with the house as a unit. Therefore, he seeks to amend his return and report the gains realized from their sale as gains on the sale of capital assets. We have no doubt on this record that petitioner purchased the tract of *51 land here in controversy with Silverman for the general purpose of subdividing it, building houses thereon and selling the improved properties in the ordinary course, and they did, in fact, subdivide the property into 27 lots and subsequently sell four improved lots. Clearly, any gains from such sales would constitute ordinary income, since the lots thus sold were held by petitioner "primarily for sale to customers in the ordinary course of his trade or business." The fact that the 14 lots here in issue were sold as unimproved rather than improved lots does not change the picture. Petitioner had, of course, the right to change his plans, but a change from the sale of improved lots to unimproved lots does not alter the fact that the unimproved lots, when sold, were sold in the ordinary course of business. There is nothing in the record to support the view that the 14 lots were held as an investment. We think the unimproved lots were acquired and held as an integral part of the over-all plan for the sale of lots. See O'Donnell Patrick, 31 T.C. 1175 (1959), affd. 275 F. 2d 437 (C.A. 7, 1960); James E. Kesicki, 34 T.C. 675 (1960). In any event, it is clear that petitioner has failed *52 to demonstrate error in the respondent's determination in this respect. Petitioner also contends that the 14 lots were sold in bulk, and that, therefore, such lots were not sold in the course of his real estate business but pursuant to a desire to liquidate his holdings in the subdivision. The record fails to disclose the number of transactions entered into by petitioner in his sale of the 14 lots. But assuming that all of the lots were sold in bulk, the end result would be no different. The statutory test is whether the lots were held primarily for sale to customers in the ordinary course of petitioner's trade or business. The record is clear that these lots were so held, whether they were held to be sold with a house thereon or not. That petitioner may have disposed of the lots "in bulk" does not change the manner in which they were "held" by him. Donald J. Lawrie, 36 T.C. 1117, 1121 (1961); August Engasser, 28 T.C. 1173 (1957). We conclude, therefore, that the gains realized by the petitioner on the sale of the 14 lots in issue should be taxed as ordinary income rather than as capital gains. Decision will be entered under Rule 50. Footnotes
*. It is stipulated that this total cost figure should be $66,475.00, thereby increasing the unit cost per lot and decreasing the net profits on the sale of the 14 lots accordingly.↩