**Dr. C. Grenes COLE and Mrs. Hallette
B. Cole, Appellants,**

v.

**Chester A. USRY, District Director of
Internal Revenue, Appellee.**

No. 18713.

United States Court of Appeals
Fifth Circuit.

Sept. 8, 1961.

Elton A. Darsey, Houma, La., St. Clair Adams, Jr., New Orleans, La., Adams & Reese, New Orleans, La., for appellants.

Charles K. Rice, Lee A. Jackson, Washington, D. C., M. Hepburn Many, Nicholas J. Gagliano, New Orleans, La., Burt J. Abrams, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., A. F. Prescott, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before RIVES, CAMERON and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

This case presents the oft-litigated question of whether subdivision lots should be excluded from "capital assets" as constituting "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." [1]

The Coles sued for the refund of income taxes for the calendar years 1953, 1954 and 1955, aggregating approximately $23,000.00. The case was tried to a jury which returned a verdict answering "yes" to the interrogatory: "Were the lots in suit held and sold by the taxpayers primarily in the course of their business?" On this appeal, the Coles insist, *inter alia*, upon objections to evidence,

---

[1] So far as pertinent, Section 117 of the Internal Revenue Code of 1939, 26 U.S. C.A. § 117 and Section 1221 of the Internal Revenue Code of 1954, 26 U.S. C.A. § 1221 are practically identical.

The more specific provisions of Section 1237 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1237 are not relied on by either party.

and that the district court erred in not granting them a directed verdict or a judgment notwithstanding the verdict.

That the apparent simplicity of the issue submitted to the jury is a deceptive illusion is demonstrated by the scores of appeals in cases presenting the same question under various factual settings.[2] Those cases have listed and re-listed various factors proper to be considered in determining whether property is "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." As Mertens has noted, however, those factors "in and of themselves * * * have no independent significance, but only form part of a situation which in the individual case must be considered in its entirety to determine whether or not the property involved was held primarily for sale in the ordinary course of business." 3B Mertens Law of Federal Income Taxation, Zimet & Weiss Rev., Sec. 22.138, p. 623.[3]

As if the issue were not already difficult enough for a jury to comprehensively understand and correctly decide, able, but too zealous, counsel for the Government further complicated it by artful appeals to emotion and prejudice; such as, cross-examining Mrs. Cole on whether from 1933 to 1936, about twenty years before the period here involved, her brother-in-law had held title to the property under "a fraudulent conveyance just to keep it away from your creditors," and after objection was sustained to that inquiry, further cross-examining her as to her retention of the mineral rights, so

that "if suddenly oil comes popping up he (the lot purchaser) is out of luck, because that is your property?" Again objection was sustained, but it is doubtful whether the innuendo was dispelled from the minds of the jurors.

In this setting, Government counsel were permitted further to divert the issue by cross-examining Dr. Cole and Mrs. Cole at great length concerning their claimed deductions from ordinary income for telephone expenses, stationery and supplies, bank charges, legal and tax services, and automobile expenses. The effort was to establish by a process of elimination that these business expense deductions were connected with the sale of the lots. The theory upon which the district court permitted such cross-examination is shown by its charge to the jury that, "If you find that any of these deductions related to the lots in question, these claimed deductions under consideration, you may consider this as an admission against the plaintiffs' interest."

Insisting on appeal that such testimony was admissible as showing an "admission against interest," the Government relies upon a series of cases to the effect that the taxpayer's listing his occupation as including dealing in real estate may be considered as an admission against interest.[4] Those cases differ from the present one in that here any circumstantial effect of the claimed deductions as admissions of the ultimate question was expressly negatived in the very same returns by the taxpayers' claim that their gains were capital gains.[5] We need not, how-

---

2. Some of the earlier cases are listed in Lobello v. Dunlap, 5 Cir., 1954, 210 F. 2d 465, 468, note 3, and some of the more recent cases in Barrios' Estate v. C. I. R., 5 Cir., 1959, 265 F.2d 517, 519.

3. In a footnote, Mertens further observes: "It is difficult to attach an absolute or specific degree of importance to the particular factors involved, and in part the weight of any one factor has depended on the combination of others with which it occurred.

   " 'If a client asks in any but an extreme case whether, in your opinion, his sale will result in capital gain, your answer should probably be, "I don't know, and

no one else in town can tell you." ' Comment, 'Capital Gains: Dealer v. Investor Problems,' 35 Taxes 804, 806 (1957)." 3B Mertens Law of Federal Income Taxation, Zimet & Weiss Rev., Sec. 22.138, n. 69, pp. 623, 624.

4. White v. Commissioner, 5 Cir., 1949, 172 F.2d 629, 630; Thomas v. Commissioner, 5 Cir., 1958, 254 F.2d 233, 236; Kaltreider v. Commissioner, 3 Cir., 1958, 255 F.2d 833, 839; Oliver v. Commissioner, 4 Cir., 1943, 138 F.2d 910.

5. Whether a taxpayer is an "investor" or a "dealer" in real estate is of course important in determining the nature of his

ever, hold that such testimony was entirely inadmissible, for we are of the opinion that its probative value was so slight that it could not convert into a jury issue what would otherwise be a question of law.

In this case several of the witnesses had been subpoenaed by both sides, and all who testified were actually introduced by the plaintiffs. In addition to the two taxpayers themselves, the witnesses consisted of an expert on the sugar industry to show the effects of the "mosaic disease" on growing sugar cane, the two engineers who had surveyed and platted the property, the contractor who had cleared and leveled the property and graded the roads, the shell dealer who had shelled the streets, the taxpayers' accountant who had prepared their returns, and their lawyer who had handled the sales of the lots.

The uncontroverted evidence concerning the acquisition and sale of the real estate in question is as follows. In 1927 Mrs. Cole purchased 553.9 acres of land from R. R. Barrow, Inc., a family corporation. The land had been in Mrs. Cole's family since 1826 and contained the family residence. In 1935, 150 acres were sold to the Parish of Terrebonne for an airport, and in 1943, another 200 or 300 acres were condemned by the United States for a naval air station. During 1951 and 1952, Mrs. Cole employed engineers and contractors to lay out three adjoining subdivisions on about 50 acres of the remaining 100 to 200 acres of the original tract. The South Terrebonne subdivision was staked off into 42 lots in 1951. No streets or roads were required since all the lots faced on the highway. In 1952 the Roberta Grove and Oleander subdivisions of 57 and 14 lots, respectively, were laid out. A general contractor cleared the property and cut and graded four streets with drainage ditches. The streets were then shelled as required by local ordinance. No facilities for water,

sewage, gas, or electricity were installed in any of the three subdivisions. The overall expenditures in making the subdivisions came to $8,458.19.

Between 1951 and 1956, 93 lots were sold in 61 transactions with profits averaging between 74 and 97% of the sales price. The only advertising undertaken was a "For Sale" sign along the highway with Mrs. Cole's telephone number on it. Mrs. Cole's attorney, Elton Darsey, handled the details of all the sales, and any customers who did not go to him directly were referred to him by Mrs. Cole. Mr. Darsey's compensation was paid by the purchaser. The notes on installment sales were collected by a local bank. Mrs. Cole retained all mineral rights in the land and incorporated restrictive covenants in the deeds. In 1955 an aerial photograph was taken of the remaining acreage for possible future subdivision.

During this period Mrs. Cole would spend long weekends at the family residence to handle all necessary matters which included, besides the sale of the lots in question, the managing of some 5 or 6 thousand acres leased out for pastures, farming, warehouses, and oil rights. The rest of the week was spent at the Cole's rented residence in New Orleans. With respect to the subdivisions, Mrs. Cole handled all matters personally except for the final sale concluded by Mr. Darsey.

Let us turn to some of the factors to be considered in determining whether the lots were held and sold by the taxpayers primarily in the course of their business.

First, as to the classification important in determining the nature of the taxpayers' business; that is, whether either of them more nearly meets the general description of an "investor" or that of a "dealer." Dr. Cole has been a licensed physician since 1908 and actively engaged in his profession until he retired in 1950. He was Coroner of the Parish of

business, but even a dealer may hold particular properties for investment rather than for resale, so the admission that one is a dealer is not contradicted by a claim

of capital gains. See 3B Mertens, Zimet & Weiss Rev., Law of Federal Income Taxation, Secs. 22.138, 22.139.

Orleans from 1934 to 1950 and served as President of the Louisiana State Medical Society in 1940. Upon his retirement as Coroner, he became Secretary-Treasurer of the Louisiana State Medical Society, which position he still holds. Mrs. Cole, in addition to being a housewife, has been the business manager for herself and Dr. Cole, and for the family corporation, R. R. Barrow, Inc. In 1952, Mrs. Cole had actively participated in a 158-lot subdivision of some of the corporate property. She received substantial salaries from the corporation—$5,100.00 in 1953, $8,700.00 in 1954, and $8,000.00 in 1955. Dr. and Mrs. Cole owned five or six thousand additional acres in Terrebonne Parish which they leased out for various purposes, including "oil leases, pastures, farming, and warehouses." Other than the lots involved in this case, and except for two homes, neither Dr. Cole nor Mrs. Cole had ever sold any lots of land. There was no evidence that the proceeds of sale from the lots here involved were reinvested in property held for sale. We conclude that neither of the taxpayers can fairly or reasonably be classed as a "dealer" in the sale of lots.

The district court, after detailing various other factors to be considered by the jury, charged that, "of the foregoing factors, the ones to which you should give the most weight are the extent and continuity of the sales." The plaintiffs objected to that instruction. Without stopping to decide on whether these factors are entitled to "the most weight," let us briefly review the extent and continuity of the sales. The total number of lots included in all three subdivisions was 114 lots. Of these 8 were sold in 3 transactions in 1951, 27 in 20 transactions in 1952, 38 in 29 transactions in 1953, 15 in 9 transactions in 1954, 2 in 1 transaction in 1955, 3 in 2 transactions in 1956, and in the intervening three or four years before trial the remaining 21 lots were sold. There are many cases where this Court has held the taxpayers entitled to capital gains treatment in which the

frequency and continuity of sales were more intense than in the present case; e. g., Goldberg v. Commissioner of Internal Revenue, 5 Cir., 1955, 223 F.2d 709 (90 houses and lots in one year); Ross v. Commissioner of Internal Revenue, 5 Cir., 1955, 227 F.2d 265 (235 lots in 38 transactions in 2 years); Consolidated Naval Stores v. Fahs, 5 Cir., 1955, 227 F.2d 923 (over 100 sales totaling 200,000 acres in one year).

The case most like the present case on its facts involved lands only about three miles distant from the lots here involved. Barrios' Estate v. C. I. R., 5 Cir., 1959, 265 F.2d 517. There more acreage was sold over a longer period of time than in this case. The Barrios farmed 165 acres of land until it became unsuitable. Between 1939 and 1953, Mrs. Barrios divided it into six subdivisions, making such improvements as clearing and the installation of streets, water mains, and culverts. She did not advertise the availability of lots. This Court held that the profits were taxable as capital gain rather than as ordinary income.

The improvements on the land in preparing it for sale were more extensive in Barrios than in the present case. Indeed, the amount of improvement in this case was so nominal that the sale of the lots amounted to little more than piecemeal sale of the acreage. The advertising in the present case was practically nil. Barrios, and practically all subdivisions, incorporate restrictions and restrictive covenants in the deeds. Mrs. Cole handled many of the matters concerning the preparation of the lots personally, but there is no indication that any more time was put into the sale of the lots than the minimum required to sell lots in any subdivision case. Sales activity was nominal. The interval elapsing between the acquisition of the property and its sale was about a quarter of a century.

We appreciate the extremely limited scope of review by this Court of a judgment entered on a jury's verdict.[6] Nev-

6. Whether "reasonable men could reach differing conclusions on the issue," Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct.

ertheless, this Court owes a duty not as a mere automaton, but as a judicial function to determine whether there is really a rational basis for a jury's verdict. See Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443, 445. Somewhat paradoxically in the present case, a clearer view can be had of the reasonableness of the answer to the ultimate question, than of whether different conclusions could reasonably be reached on any one or more of the factors to be considered in answering that question. Considering the case in its entirety, it seems clear to us that the controlling facts are so extreme as to make it utterly unreasonable to hold that the property here involved was held by the taxpayers primarily for sale to their customers in the ordinary course of their trade or business. Unless every jury verdict in cases of this kind is to be upheld, this one should be set aside and judgment for the plaintiffs should be entered notwithstanding the verdict. It is accordingly so ordered.

Reversed with directions.

WISDOM, Circuit Judge (dissenting).

The issue in this case for the jury to decide was whether the taxpayers were entitled to treat their profits from the sales of the lots in question as capital gains or as ordinary income—an issue that would seem more suitable for decision by a court than by a jury. In determining whether, *in a tax sense*, subdivided real estate is held for sale to customers in the ordinary course of business, proper elements for the jury to consider, among many other relevant elements, include: (1) the intent of the taxpayer; (2) the history and use of the property; (3) the general conduct of the operation: the number, frequency, and continuity of transactions; and (4) the activities of the taxpayers in connection with promoting and handling sales. Here, many of the important evidentiary facts are undisputed. The inferences to be drawn from the facts, however, do not point in only one direction. The jury must resolve the conflict in the inferences and come up with an answer in accord with a highly technical tax concept. In this situation, therefore, although the case turns on the facts, the jury comes about as close as it is possible for a jury to come to being a law-finding agency. This is not unusual in tax refund cases, but when such law-finding requires the jury to understand and apply a section of the Internal Revenue Code so uncertain that it means one thing in the Ninth Circuit and another thing in the Fifth Circuit—it is apparent that there are flaws in the jury system not dreamt of when Blackstone called it "the glory of English law".

I make these observations because, with respectful deference to the views of the majority, as I see it, the trouble lies with the use of a jury in such a case, and not with the jury's verdict in this case. Juries today are being asked to decide questions beyond their competency to decide. Had I been on the jury, I think that, perhaps, I might have decided in favor of the taxpayers. Had there been no jury, I think that, perhaps, because of Barrios and other Fifth Circuit decisions, I should feel compelled to hold for the taxpayers; the Government's position goes beyond the congressional purposes of the statute. But the taxpayers asked for a jury and appellate review is restricted to the confining limits of the "substantial evidence" rule. Applying to this case the same sort of test we apply in a negligence case, or to jury cases generally, I cannot bring myself to saying that there was no rational basis for the jury's verdict.

In Barrios' Estate v. C. I. R., tried without a jury, relied on in the majority opinion as the case most like the present case, Judge Cameron, speaking for a

1190, 1199, 4 L.Ed.2d 1218; could "such conclusions could with reason be reached on the evidence"? United States v. Kaiser, 1960, 363 U.S. 299, 305, 80 S.Ct. 1204, 1207, 4 L.Ed.2d 1233; "the requirement is for probative facts capable of supporting, with reason, the conclusion expressed in the verdict," Myers v. Reading Company, 1947, 331 U.S. 477, 485, 67 S.Ct. 1334, 1339, 91 L.Ed. 1615.

unanimous court, pointed out the broad scope of appellate review when the conclusion of the trial court as to the ultimate fact is merely a product of the court's legal reasoning: "The question presented to the Tax Court was one of law, the case being submitted upon stipulation and the testimony of [the] taxpayer and two purchasers of lots from her." [265 F.2d 518.]

In Barrios the land was bought for farming purposes and the subdivision and sale of farm land in 1939 resulted from the completion three years before of the Intercoastal Canal which "created such drainage problems that it was not feasible to * * * farm, and its operation was abandoned". Here, the evidence shows that Houma had a rapid expansion as a result of oil and gas development in the Houma-Thibodeaux area. This undisputed evidence and the evidence generally of Mrs. Coles' activities with respect to the property furnish a rational basis for a jury to infer that Mrs. Cole, an experienced business woman, capitalized on the demand for Houma residential lots by holding the real estate for sale to customers in the ordinary course of business; or, for the jury to conclude that the taxpayers failed to carry the burden of proof necessary for recovery of a tax refund.

Intent, a fact issue, is an important element in these subdivision cases. Traditionally, of course, intent is regarded as a jury question. Here, the taxpayers deducted from ordinary income more than $3000 for "business" expenses for each of the tax years in question. These deductions covered expenditures for automobile expenses (depreciation, repairs, washing, greasing, gasoline, insurance), purchase of a typewriter and adding machine, telephone calls, stationery, legal expenses, and other items attributable to activities related to the "business" of holding, improving, and selling the property. The 1955 return stated, with respect to automobile expenses, "85 per cent attributable to business". It is undoubtedly true that the tax returns, in treating profits from the real estate transactions as capital gains, are inconsistent with the taxpayers' deducting such expenditures as business expenses—but such inconsistency does not erase the fact that the deductions were claimed; it is for the jury to choose between two conflicting inferences as to intent, drawn from the tax returns. On this point, the district court instructed the jury: "You will understand that if people are in a business they have a right to claim business deductions. And if they are not in the business, they have no right to claim business deductions. That is one of the issues in the case, * * *" To me, this is a pertinent, correct instruction. Relying on it, a jury might rationally decide that the Coles thought they were in the real estate business and their deductions indicate that it was a business; if the Coles did not think so, but still claimed deductions for business expenses related to the real estate, they were something less than credible witnesses.

As I read the court's charge, it was extremely fair and, if favorable to either party, favorable to the taxpayers. For example, the court spoke of the jury having to decide whether Dr. and Mrs. Cole "were in the business of selling real estate during the years involved". This language is more restrictive than the statutory language. The statute treats the gains as ordinary income, even if a taxpayer is not "in the real estate business", provided that the property is held primarily for sale to customers. The statute merely requires that the property be *held* for sale to customers in the ordinary course of the business. The Coles' counsel fully understood the importance of the instruction, as is evident from his motion for a Judgment N. O. V. or, in the alternative, a New Trial: the motion states that "there was no evidence in the record upon which the jury could predicate a finding that Dr. C. Grenes Cole and Mrs. Hallette B. Cole, plaintiffs, were engaged primarily in the business of selling real estate for a profit." Government counsel objected to the court's instruction that the jury should decide whether the taxpayers were in the real

estate business, and objected to the court's entire charge. (The taxpayers' counsel also objected to certain charges. These objections I would classify as somewhere between trivial and insubstantial.)

The jury was conscientious. After retiring, it returned for additional instructions. The foreman stated: "The question has come up in our discussions, and this has come up in the verdict, which reads, 'Were the lots in suit held and sold by the taxpayers primarily in the course of their business?' There have been discussions relative to the meaning or clarification of 'their business'." The court then reread to the jury "all the criteria which courts have considered in determining whether or not the taxpayers were in a business". These instructions are detailed, but they show how carefully the court considered the case in charging the jury. As I understand the case, the instructions correctly state the law as the Fifth Circuit interprets it.

The district court was very careful in its charge to give all of the criteria bearing on the question at issue. It refrained from taking any short cuts that might mislead a jury. With deference, I suggest that the case cannot be reduced to an "either-or" classification of the Coles as "investors" or "dealers". Mertens puts it: "Classification of a taxpayer as an 'investor' or 'dealer' is not enough, however, to determine the tax consequences to him of a disposition of real estate. The Code does not use these terms in the statutory provisions described above, and which class best suits the taxpayer is not the ultimate object of inquiry in determining whether a taxpayer is to be accorded capital gain or loss treatment. The ultimate question is whether the taxpayer has been holding the property primarily for sale to customers in the ordinary course of his business. That is the question to be answered, and not whether he is a dealer or investor * * *. Similarly, it is necessary to remember the ultimate question in considering certain factors which on various occasions have received emphasis by the courts in determining the treatment to be accorded a taxpayer. These factors are often said to show whether or not a taxpayer is a dealer. In and of themselves, however, they have no independent significance, but only form part of a situation which in the individual case must be considered in its entirety to determine whether or not the property involved was held primarily for sale in the ordinary course of business." 3B Mertens, Law of Federal Income Taxation, § 22.138, p. 622.

In my humble judgment, the only thing clearly irrational about this case is that the law compels a jury of laymen to function as a court in deciding a doubtful, unsettled, legal question that would be a toss-up if it were submitted to a court composed of tax experts.