FRITZ THOMPSON AND DORA M. THOMPSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85740.  Filed April 26, 1962.

*Wentworth T. Durant, Esq.*, and *Robert Edwin Davis, Esq.*, for the petitioners.

*Robert I. White, Esq.*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income tax for the calendar years 1957 and 1958 in the amounts of $10,882.37 and $21,262.43, respectively.  The issues for decision are whether petitioners realized long-term capital gain on the sales of various lots in the years 1957 and 1958 and whether Commodity Credit Corporation loans totaling $15,486.06 made to petitioners in 1958 resulted in taxable income to them during 1958.

### FINDINGS OF FACT.

Petitioners, husband and wife residing in Borger, Hutchinson County, Texas, filed their joint income tax returns for the years 1957 and 1958 with the district director of internal revenue at Dallas, Texas.

Fritz Thompson (hereinafter referred to as petitioner) was during the years here involved primarily a farmer and rancher and spent about 70 to 75 percent of his time in this endeavor.  During these years petitioner also was president of a hotel corporation in Borger, was on the board of directors of two banks, and had civic duties as president of the Texas Good Roads Association.

On April 7, 1942, petitioner purchased a 100-acre tract of land for $5,000 from a family named Weatherly.  The tract was located on the west side of the townsite of Borger and situated on both sides of the route along which a highway was being constructed.

At that time all of the land surrounding the city limits of Borger was owned by four large landowners, including the Weatherlys, who owned the land south of the townsite.  Since the four owners were reluctant to sell any of their holdings, it was well known that it was difficult to acquire any land adjacent to the corporate limits of Borger.  Petitioner felt that at the price of $5,000 the tract would be a good

investment. Also, the tract was then occupied by approximately 100 tenants, who had erected shacks or shanties on the land and were paying annual ground rentals to the Weatherlys under year-to-year leases. Petitioner considered the rental income to be especially attractive since he was planning to offer his services to the Army and he felt that if he should not return from the armed services, the rents would afford a livelihood for his family.

The period from the latter part of 1942 to 1949 was one of unusual expansion for the Borger, Texas, area because of additions to the refining facilities of the Phillips Petroleum Company, located about 2 miles northeast of Borger, and particularly because in August 1942, construction was begun on a site about 3 miles west of Borger of a synthetic rubber plant which was to be operated for the Defense Plants Corporation by the Phillips Petroleum Company. There was an influx of thousands of construction workmen into the Borger area in the early part of 1943. As a result, there was a housing shortage in Borger, and it developed so quickly that it was not foreseen by the city manager of Borger or by residents of the town generally.

The Phillips Petroleum Company became interested in acquiring land for housing the large number of new employees in its refinery and the new rubber plant. Phillips intended to buy the land and then reconvey it to a builder who, in turn, would subdivide it into lots and blocks for sale to individuals. After the lots were sold, it was planned that the owners would then borrow funds for the erection of houses thereon. Periodically, from 1943 through 1947, a representative of Phillips talked with petitioner and with the four principal landowners in the Borger area in an effort to purchase land which could be used to alleviate the housing shortage. Much of the land within the 100-acre tract, which petitioner had acquired, was hilly, broken by gulleys and deep ravines, and relatively undesirable as a site for residential building. In 1943, petitioner offered to sell the entire tract to Phillips at $500 per acre and in November 1944, petitioner quoted Phillips a price of $1,000 per acre on 42 acres of the most level and desirable land in the 100-acre tract. Phillips declined both offers.

Phillips decided not to purchase the land from petitioner, because (1) the total cost involved in buying and making the land suitable for housing would be excessive, and (2) the mineral interests in the land had previously been conveyed to numerous persons, and Phillips could not devise any scheme for clearing the title to the property so as to enable future owners of the lots to pledge them as security for homebuilding loans.

In 1942 the need was noted for the passage of a platting ordinance for Borger, which would require that all land used for business or residential purposes within the city and contiguous residential areas

to be annexed to the city, be platted into lots and blocks, with streets and alleys dedicated to public use in order that a sanitary water supply and public sewers could be provided for all residents of the town and such adjacent residential areas. From 1942 until 1946 the officials and townspeople of Borger considered such an ordinance. During this period petitioner was made aware that the proposed platting ordinance would apply to his tract. The ordinance was passed and went into effect about January 7, 1946. It provides in part as follows:

It shall hereafter be unlawful for any person, firm, partnership or corporation to lease, let or grant any area, plot or parcel of land within the city of Borger, Texas, for residential purposes or for human habitation unless and until the said land is platted and designated by blocks and lot numbers and to serve which adequate rights-of-way have been dedicated to the public use in conformity with and connecting with public rights-of-way in adjacent platted areas of the said city.

Petitioner's purchase, known as the Thompson Addition, was subdivided into four tracts as follows:

| Tract | Dedication filed of record |
|---|---|
| Unit 1 | Nov. 10, 1944 |
| Unit 2 | Oct. 27, 1945 |
| Unit 3 | Mar. 5, 1947 |
| Unit 4 | Mar. 3, 1948 |

Unit 4 consists of approximately the southern one-sixth of the Thompson Addition. Unit 3 is situated contiguous to and north of unit 4 and is about the same size as unit 4. The remaining two-thirds of the tract is divided roughly into an east part, unit 2, and a west part, unit 1.

Although the plats to unit 1 and unit 2 of the Thompson Addition were filed by petitioner some months before the city platting ordinance became effective, petitioner was fully acquainted with the purpose, effect, and provisions of the proposed ordinance prior to the time any of the lots were sold, and he decided that it was in his best interest to cooperate with the city officials by complying with the spirit and the provisions of the proposed ordinance prior to its passage.

Prior to the dedication of any of the units, petitioner sold two parcels of land from the Thompson Addition; one parcel of 3.85 acres to the Borger Independent School District, the other parcel of an unspecified amount to an individual named Sappington.

When petitioner acquired the 100-acre tract, it was then occupied by approximately 100 squatters or land renters, who lived in shacks located principally in two areas on the tract. These two areas were located in what later was dedicated as unit 1 of the Thompson Addition to Borger, Texas. The people who were occupying the property came by to pay their ground rent to petitioner, and quite often when

paying the rent asked if they might buy the property they were on. During 1944 petitioner stated to the squatters or land renters who inquired that he would be willing to plat an area for sale to the tenants if they could find a portion of the tract where they all could locate together. He suggested an area lying in the northwest portion of the tract and also informed the group that he intended to comply with the proposed city ordinance in laying out the plat. Petitioner made a rough sketch of a subdivision of lots and blocks with streets and alleys set aside for public use. As individual lots were selected, he wrote down the names of the prospective owners opposite the lot and block numbers. Later, he employed an engineer to prepare a plat in conformity with the terms of the city's proposed platting ordinance. About 90 percent of the shack owners subscribed for lots even before the plat was filed. However, many of them were poor people who were unable to pay for the lots at that time, and they entered into contracts with petitioner to purchase the lots on an installment basis. When the lots were paid for, the deeds were executed.

In the summer of 1945 a group of Borger businessmen called on petitioner, stating that they had joined together for the purpose of obtaining some land in Borger upon which they could erect good homes which would be protected by building restrictions. They requested petitioner to make a portion of his tract available for that purpose, and he agreed to do so. He told them to select the area they desired and also pointed out that it would be laid out in lots and blocks and streets and alleys in conformity with the proposed platting ordinance of the city of Borger.

In October 1945, the act of dedication of unit 2 of the Thompson Addition to the city of Borger was prepared and filed. Although more than one-half of the lots were subscribed to by businessmen before the plat was filed, the delivery of the deeds of the lots extended over a period of several years. Many of the subscribers did not pay for their lots or obtain deeds until they could obtain the necessary materials for constructing homes or until they were otherwise prepared to build.

Unit 3 of the Thompson Addition was platted in 1947 under about the same circumstances as was unit 2. People desiring homesites approached petitioner, and as was the situation in units 1 and 2, most of the lots were subscribed for at or before the filing of the plats but the actual consummation of the sales or delivery of the deeds extended over a period of several years.

Unit 4 of the Thompson Addition was platted and dedicated during March 1948. This was done in order that petitioner could sell off the rest of the 100-acre tract that he had purchased from the Weatherlys. Unit 4 was platted at the same time that sales were being made in units 1, 2, and 3.

In each of the four units of the Thompson Addition specific areas were dedicated for specific uses. In unit 1 there were 5 lots dedicated for "business purposes" and 119 residential lots. In unit 2, 7 of the lots were dedicated for "business and other purposes," 102 lots for residential purposes, and 4 lots for a church. In unit 3 there were 54 lots dedicated for "residential purposes" and 42 lots for "business and other purposes." One whole block in unit 3 was dedicated for use as a playground.

In unit 4 one whole block was designated as "Thompson Park" and was dedicated for public use under the jurisdiction and control of the city of Borger. Nine lots in unit 4 were designated for use for single and double dwellings or character-building institutions or the like. The other 46 lots in unit 4 were designated "for business and other purposes."

In most instances the lots designated for business or other purposes were so designated because they were adjacent to one of several highways which cut through the Thompson Addition, making such properties unsuitable for residential use. Also, with respect to unit 4, petitioner felt that the high cost of filling in certain of the lots eliminated the possibility of their being used for residental purposes. In every instance petitioner made the choice between residential and business use basing his choice on his judgment as to which designation would be more advantageous for the purpose of sale. The unit of sale in the Thompson Addition was per lot although on many occasions throughout the period 1944 to 1958 buyers purchased more than one lot in one transaction.

After all the units were platted, there were approximately 387 lots in the Thompson Addition owned by petitioner. There were 22 other lots not owned by petitioner which were dedicated in unit 2 of the Thompson Addition by their respective owners.

During the years 1944 through 1958 according to his income tax returns petitioner had sold 376½ lots. The following table shows the number of lots sold in each of the units during each of the years involved:

| Year | Unit 1 | Unit 2 | Unit 3 | Unit 4 [1] | Total |
|---|---|---|---|---|---|
| 1944 | 5 | 1 | | | 6 |
| 1945 | 49 | 10 | | | 59 |
| 1946 | 63 | 54 | | 1 | 118 |
| 1947 | | 14½ | 9 | | 23½ |
| 1948 | | 9½ | 14½ | 4 | 28 |
| 1949 | | 6½ | 11 | 5 | 22½ |
| 1950 | | 2 | 27 | 3 | 32 |
| 1951 | 1 | 10½ | 9 | | 20½ |
| 1952 | | 1½ | 3½ | 4 | 9 |
| 1953 | | 1 | 4 | 2 | 7 |
| 1954 | | | 1 | 1 | 2 |
| 1955 | | | | 5 | 5 |
| 1956 | 2 | | 1 | 13 | 16 |
| 1957 | | | 8 | 12 | 20 |
| 1958 | | | 4 | 4 | 8 |
| Total | 120 | 110½ | 92 | 54 | 376½ |

[1] One lot given to Girl Scouts in 1946—not included herein.

Following is a schedule of gross income, expense incurred, and net profit realized from the sale by petitioner of lots in the Thompson Addition to Borger during the period 1944 through 1958:

| Year | Gross sales | Expenses and cost of lots | Net profit |
|---|---|---|---|
| 1944 | $1,475.00 | $987.55 | $487.45 |
| 1945 | 22,566.50 | 10,790.95 | 11,775.55 |
| 1946 | 60,639.20 | 34,258.38 | 26,380.82 |
| 1947 | 28,850.00 | 15,087.67 | 13,762.33 |
| 1948 | 36,959.30 | 17,737.13 | 19,222.17 |
| 1949 | 29,451.50 | 11,761.05 | 17,690.45 |
| 1950 | 56,045.00 | 39,345.31 | 16,699.69 |
| 1951 | 36,853.75 | 19,988.65 | 16,865.10 |
| 1952 | 20,750.00 | 11,501.82 | 9,248.18 |
| 1953 | 25,035.00 | 17,276.75 | 7,758.25 |
| 1954 | 4,000.00 | 2,226.55 | 1,773.45 |
| 1955 | 13,850.00 | 3,998.50 | 9,851.50 |
| 1956 | [1] 34,550.00 | 12,498.51 | 22,051.49 |
| 1957 | [1] 51,700.00 | 13,660.61 | 38,039.39 |
| 1958 | [1] 41,975.00 | 8,343.89 | 33,631.11 |
| Total | 464,700.25 | 219,463.32 | 245,236.93 |

[1] Gross sales include amounts collected on installment sales.

The income tax returns filed by petitioner show the following sources and amounts of gross income for the years 1944 through 1958.

| Year | Salary [1] | Rental property (apts.) | Farm income (except cattle) | Cattle sales | Ground rents | Oil and gas rentals |
|---|---|---|---|---|---|---|
| 1944 | $2,250.00 | $4,433.40 | $8,894.62 | | $429.54 | $320.00 |
| 1945 | 2,729.84 | 4,291.65 | 3,066.99 | | | |
| 1946 | 3,000.00 | 4,446.61 | 10,091.67 | | | |
| 1947 | 3,000.00 | 4,297.00 | 19,657.90 | | | |
| 1948 | 3,600.00 | 4,375.00 | 17,003.73 | | | |
| 1949 | 3,600.00 | 4,774.00 | 10,666.37 | | | |
| 1950 | 3,600.00 | 4,585.00 | 2,750.35 | | 900.00 | 320.00 |
| 1951 | 3,600.00 | 4,550.00 | 1,086.44 | | 2,700.00 | 320.00 |
| 1952 | [2] 7,229.63 | 4,567.87 | 7,636.80 | | 900.00 | 320.00 |
| 1953 | [2] 7,798.16 | 4,455.65 | 2,029.55 | | 1,800.00 | 160.00 |
| 1954 | [3] 7,950.00 | 3,618.50 | 10,516.35 | | 1,800.00 | |
| 1955 | [3] 8,400.00 | 4,399.26 | [4] 6,397.98 | | 1,800.00 | |
| 1956 | [3] 5,250.00 | 4,398.16 | 4,225.53 | | 1,800.00 | |
| 1957 | | 4,200.00 | [5] 15,368.35 | $56,794.23 | | |
| 1958 | | 4,583.34 | [5] 9,136.19 | 117,022.11 | | 556.00 |
| Total | 62,007.63 | 65,975.44 | 128,528.82 | 173,816.34 | 12,129.54 | 1,996.00 |

| Year | Real estate sales (sales price) | Miscellaneous income | Oil and gas royalties and lease bonuses | Interest | Fees from Phillips Petroleum Company | Total |
|---|---|---|---|---|---|---|
| 1944 | $1,475.00 | $245.00 | | | | $18,047.56 |
| 1945 | 22,566.50 | 200.00 | | | | 32,854.98 |
| 1946 | 60,639.20 | | | | | 78,177.48 |
| 1947 | 28,850.00 | | | | | 55,804.90 |
| 1948 | 36,959.30 | 7.50 | | | | 61,945.53 |
| 1949 | 29,451.50 | 1,037.18 | | | | 49,529.05 |
| 1950 | 56,045.00 | 36.50 | | $68.50 | | 68,305.35 |
| 1951 | 36,853.75 | 553.63 | | 26.25 | | 49,690.07 |
| 1952 | 20,750.00 | 564.56 | | 461.32 | | 42,430.18 |
| 1953 | 25,035.00 | 125.00 | | 1,161.78 | | 42,565.14 |
| 1954 | 4,000.00 | 766.00 | | 288.48 | $4,000.00 | 32,939.33 |
| 1955 | 13,850.00 | 210.00 | $13.56 | 1,063.68 | 1,230.36 | 37,364.84 |
| 1956 | [6] 34,550.00 | 445.38 | 5,825.19 | 530.46 | 3,067.24 | 60,091.96 |
| 1957 | [6] 51,700.00 | 878.32 | 48.54 | 6,411.49 | | 135,400.93 |
| 1958 | [6] 41,975.00 | 2,283.30 | 7,024.20 | 4,586.10 | | 187,166.24 |
| Total | 464,700.25 | 7,352.37 | 12,911.49 | 14,598.06 | 8,297.60 | 952,313.54 |

See footnotes on following page.

In order to make the Thompson Addition land suitable for sale, petitioner expended for improvements on units 1, 2, and 3 the following amounts for the purposes indicated during the period ending with 1949:

| | |
|---|---|
| Leveling, grading, and filling | $39, 660 |
| Paving sidewalks | 7, 600 |
| Paving streets and alleys | 18, 235 |
| Drainage facilities | 1, 708 |
| Other | 13, 297 |
| Total | 80, 500 |

The only work done by petitioner on unit 4 was the installation of a small amount of drainage tile. Petitioner also cooperated with the city and the local school district in opening up the streets in unit 4. He paid an assessment on a front footage basis to the city for all paved streets placed where he owned property in unit 4. Several of the lots in unit 4 required extraordinary amounts of filling to condition them for use. Two purchasers spent $7,000 and $12,000, respectively, in filling in land owned by them in unit 4.

Petitioner did not grade or fill unit 4 because prospective purchasers did not seem to care whether the properties were graded or filled. The lots could be sold without such work.

Petitioner used his own best judgment in pricing the lots throughout the Thompson Addition. He adopted a uniform price per front foot and made adjustments from time to time to bring the selling price of unsold lots into line with the progressive fair market value.

After the units in the Thompson Addition were platted and the streets dedicated, all of the lots were available for sale. There were no areas in the whole Thompson Addition that were not for sale. None of the property was being held for investment or rental purposes. If the lots could have been sold during a 1-year period petitioner would have sold them all. The circumstances of the market in Borger and petitioner's mode of selling the lots resulted in the sale of the lots being spread from 1944 to 1958.

Footnotes to table on p. 158.

[1] During the years 1944 through 1951, salary received from Hutchinson County.

[2] Salary received as follows:

| | | |
|---|---|---|
| *1952:* Fritz Thompson (Hutchinson Co.) | | $3, 600. 00 |
| Dora M. Thompson | | 3, 629. 63 |
| | | 7, 229. 63 |
| *1953:* Dora M. Thompson | | $2, 548. 16 |
| Fritz Thompson: | | |
| Chamber of Commerce | $3, 300 | |
| City of Borger | 1, 950 | 5, 250. 00 |
| | | 7, 798. 16 |

[3] Salary received from city of Borger.

[4] Farm income for 1955 includes some damages from oil companies and station rental, but excludes $5,839.40 which was taken to be payments for rights-of-way.

[5] Farm income for 1957 and 1958 did not include damages received from oil companies; adjustments were made to correct this in the statutory notice of deficiency.

[6] These amounts include proceeds of outright sales and collections on installment sales made in preceding years.

During the period 1944 through 1958 petitioner never employed a real estate broker or other person to sell any of the lots involved in this proceeding, and he never solicited anyone to buy any part of the tract. In every instance, the purchasers came to him, either in groups or individually.

Petitioner fixed the selling price for each of the lots, and while the prices varied in accordance with the size and location of the lots, petitioner never reduced nor offered to reduce any of the prices fixed by him. The lots were never advertised for sale nor was a "For Sale" sign ever posted on the property. Petitioner never had a realtor's license.

During the 1940's, since the population of Borger almost doubled and the industrial expansion created a great shortage of building lots in Borger, it was not necessary for petitioner to do extensive advertising and promoting in order to sell his lots. Petitioner described the situation as follows:

There was a great demand for lots during the middle and late forties and I would be called at home or maybe somebody would meet me on the street or at various places and indicate that they wanted to buy a lot to get out with their friends in a place where the type of housing was better and a place that was being principally used by the business men of the City.

During the 1950's, although there have been other real estate developments in and around Borger, the real estate market continued to be close. For years it has been generally known by the people of Borger that petitioner owned the lands in the Thompson Addition.

During the years 1946 through 1949, inclusive, petitioner spent about 10 percent of his time on the Thompson Addition. This included the time he spent in talking with several groups who desired to erect housing on the land, the time involved in having the lands prepared, the time spent in making the land suitable for homesites, the time required for signing deeds, and the time devoted to talking with buyers who came in to see him.

For the years 1946 to 1949 petitioner sold 192 lots involving all four units of the Thompson Addition. He reported the gains from the sale as long-term capital gain. There ensued controversy with the Government with respect to the proper tax treatment for the gains terminated by a decision of the United States Court of Claims rendered in 1956 in which it was held that "for these years a substantial part of taxpayer's business was the sale of the lots and, therefore, that they were sold in the ordinary course of his trade or business, and are taxable as ordinary income."

Petitioner did not change his mode of selling his lots after the decision of the United States Court of Claims. The 20 lots sold by petitioner in 1957 were in six transactions consisting of five sales from unit 4 and one sale from unit 3; and in 1958 the 8 lots sold were in four

separate transactions consisting of three sales from unit 4 and one sale from unit 3. About one-half day of petitioner's time was devoted to consummating the six sales in 1957, and about 6 hours of his time was so occupied in connection with the four sales in the year 1958.

The following tabulation shows the sales and collections on installment sales of lots in the years involved, divided between properties located in units 3 and 4.

|  | Unit 3 | Unit 4 | Total |
|---|---|---|---|
| 1957 | $7,500 | $44,200 | $51,700 |
| 1958 | 10,500 | 31,475 | 41,975 |
| Total | 18,000 | 75,675 | 93,675 |

The collections made on installment sales in 1957 were from sales made in 1956 and the collections in 1958 were from sales made in 1956 and 1957.

During the 4-year period 1953 to 1956 petitioner consummated the number of sales in selling the number of lots as follows:

| Year | Number of lots sold | Number of sales |
|---|---|---|
| 1953 | 7 | 3 |
| 1954 | 2 | 2 |
| 1955 | 5 | 4 |
| 1956 | 16 | 7 |

Prior to the year 1958, petitioner had obtained Commodity Credit Corporation loans for some of his wheat and had elected pursuant to section 77 of the Internal Revenue Code of 1954, to report the proceeds of such loans as income in the year in which such loans were obtained. Petitioner never applied for permission from the Commissioner of Internal Revenue or his delegate to change his elected method of accounting for proceeds of loans made to him by the Commodity Credit Corporation.

During the year 1958, petitioner obtained Commodity Credit Corporation loans on wheat grown by him during that year. These loans totaled $23,392.75.

Petitioner was entitled to redeem any or all of these loans at any time before March 31, 1959, by paying the Commodity Credit Corporation the amount thereof plus interest at 3½ percent.

On December 30, 1958, petitioner redeemed two of the lots of wheat by repaying to the Commodity Credit Corporation $15,761.46 which amount included interest of $233.97. During 1959, petitioner sold the wheat so redeemed on January 9 (3,447.33 bushels, $6,030.23 proceeds), and on January 17 (4,840.83 bushels, $9,633.43 proceeds), and reported the proceeds of these sales for the taxable year 1959. The proceeds from these two sales aggregated $15,663.66.

Petitioner's decision to redeem the wheat was made after discussion with various grain dealers in the area. It was petitioner's conclusion that the price of wheat would rise and that he would make a profit by holding the wheat himself. Petitioner's decision to sell the redeemed wheat was prompted by his feeling that he could make more profit from purchasing cattle than from holding the wheat for a possible price rise. Upon the sale of the wheat in 1959, petitioner invested an equivalent amount in cattle purchases.

The market value of wheat, based upon the Fort Worth Exchange quotation was constant during the period December 29 and 30, 1958, through January 17, 1959. The proceeds of sale of the redeemed wheat received on January 9 and 17, 1959, were approximately $205 more than the proceeds would have been had the wheat been sold on December 29, and 30, 1958.

During the taxable year 1958, petitioner deducted all costs and expenses incidental to growing, harvesting, and handling the wheat that was placed with the Commodity Credit Corporation on July 25, 1958, as security for the loan of $15,486.06. Petitioner also deducted as interest expenses during the taxable year 1958 the $233.97 paid to the Commodity Credit Corporation on December 30, 1958, in connection with the repayment of loans on the wheat made on July 25, 1958.

Petitioners on their income tax returns for the year 1957 reported 5 percent of the receipts from sales of lots in the Thompson Addition sold in that year and the amount collected from installment sales in prior years as ordinary income and subtracted their basis in the lots from the balance of the sales receipts, reporting the resultant amount as long-term capital gains. On their return for the year 1958, they reported 5 percent of the gains from the sales of lots and collections on prior year installment sales as ordinary income and the balance thereof as long-term capital gains.

Respondent in his notice of deficiency increased petitioners' income for 1957 by an amount of $17,727.19 denominated "capital gain deduction" with the following explanation:

(b) It is held that you received ordinary income from sales of lots and collections on installment sales made in prior years instead of long-term capital gains as reported on your return. The deductions for capital gains are disallowed.

For the year 1958 respondent increased petitioners' income by an amount of $15,967.77 denominated "capital gain deduction" giving the same explanation as that given for the similar increase in petitioners' income for 1957.

Petitioner reported the $7,906.69 of Commodity Credit Corporation loans received and not repaid in 1958 as income from wheat in that year, but did not report the $15,486.06 of the Commodity Credit Corporation loans applicable to the wheat redeemed on December 30, 1959.

Respondent in his notice of deficiency increased petitioners' income for 1958 by an amount of $15,486.06 denominated "wheat sales" with the following explanation:

(c) It is determined that you received income of $23,392.75 from the sale of wheat instead of $7,906.69 as reported on your return. * * *

Some of the facts have been stipulated and are found accordingly.

OPINION.

The first issue is whether gains realized by petitioner during the taxable years here involved from sales of lots from a tract of land which he had previously subdivided and installment payments received during these years from sales of similar lots in prior years constituted ordinary income or long-term capital gains.

It is respondent's position that these lots were property held by petitioner primarily for sale to customers in the ordinary course of his trade or business and therefore not capital assets under section 1221 of the Internal Revenue Code of 1954.[1]

The numerous cases dealing with the question of whether property is held primarily for sale to customers in the ordinary course of a trade or business have provided no rule of thumb by which an answer may be reached. The precise facts of each case are determinative, and of the various criteria to be considered, no one constitutes a decisive test. *Kelley* v. *Commissioner*, 281 F. 2d 527 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court, and *D. L. Phillips*, 24 T.C. 435 (1955). Among the various factors to be considered are the purpose or reason for the taxpayer's acquisition of the property and disposition of it, the length of time the property is held, the continuity of sales or sales-related activity over a period of time, the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. *Friend* v. *Commissioner*, 198 F. 2d 285 (C.A. 10, 1952), affirming a Memorandum Opinion of this Court.

The instant case presents a somewhat unusual factual situation in that the case of *Thompson* v. *Commissioner*, 145 F. Supp. 534 (Ct.

---

[1] On his 1957 and 1958 income tax returns petitioner reported all the income arising from the sale of lots by a method which was apparently intended to be in accordance with the provisions of section 1237 of the Internal Revenue Code of 1954. Petitioner, neither in his petition nor on brief, has urged the applicability of section 1237 but rather contends that the subject lots were capital assets within the meaning of section 1221 of the Internal Revenue Code of 1954. However, petitioner has not sought a refund with respect to the 5-percent amounts he reported as regular income on his income tax returns. In this state of the record we do not consider the question of the applicability of section 1237 of the Internal Revenue Code of 1954 to be in issue here. It may be that this issue is not raised by petitioner because of the inapplicability of section 1237 of the Code except when a certain election is made where substantial improvements have been made on the property. Cf. *Kelley* v. *Commissioner*, 281, F. 2d 527 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court.

Cl. 1956) involved the same taxpayer (Fritz Thompson), the same Thompson Addition, and sales of lots from the same units of this tract of property as are involved in the instant case, but the taxable years involved therein were 1946 to 1949. In that case the Court of Claims held that the taxpayer held the lots sold during the years there involved primarily for sale to customers in the ordinary course of his trade or business.

Respondent does not contend that this Court of Claims decision is res judicata in the present case. Cf. *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). He does, however, take the position that the judicial determination in that case is conclusive of the fact that in the years 1946 to 1949 petitioner was in the trade or business of selling lots from each of the units of Thompson's Addition from which lots were sold in the years involved herein and that petitioner has the burden of showing that the character of the holding of the property changed in these later years.

Petitioner disagrees with this contention of respondent's. Petitioner's position is that the fact that he originally acquired the tract in 1942 as an investment should be considered but that neither his activities with respect thereto during the years 1946 to 1949 nor the decision in his case in the Court of Claims involving those years should influence the determination of whether the lots sold in 1956, 1957, and 1958 were property held by him primarily for sale to customers in the ordinary course of his trade or business. He points to the facts that no substantial improvements were made to the property in the years 1956 to 1958, that most of the lots sold in those years were from unit 4 which had not been improved other than by streets placed therein by the city for which he paid an assessment, that the lots sold in 1957 involved only six separate sales and those sold in 1958 only four separate sales, and that the time he spent in 1957 and 1958 in consummating the sales was nominal as indicating that he was not in the business of selling lots from the Thompson Addition during the years here in issue. Petitioner further contends that if he does have the burden of showing that the character of his holding of the property changed in the years here in issue from the years 1946 to 1949, the evidence herein is sufficient to show such a change. The factors to be weighed in determining whether a taxpayer is holding property for sale to customers in the ordinary course of his trade or business clearly contemplate consideration of activities with respect to the property in years prior to the taxable years in issue. The length of time the property has been held and the continuity of sales over a period of time both indicate the relevance of facts occurring in prior years. The development and improvement of the property would generally be expected to occur prior to the sale thereof. We therefore consider the facts with respect to peti-

tioner's platting and developing of the property during the years 1944 through 1949 to have a bearing on the issue involved herein. While the fact that a taxpayer acquires property for investment purposes is to be considered in cases involving the question here in issue, this fact is of little importance in the instant case since we are here bound to accept the judicial conclusion in the Court of Claims case that during 1946 to 1949 petitioner was holding the then platted lots in the tract sold during those years for sale to customers in the ordinary course of his trade or business. Sales were made in 1946 to 1949 from each unit of the tract, and it thus follows that petitioner was holding the lots in each unit for sale to customers in the ordinary course of his trade or business during the years 1946 to 1949. The fact that petitioner was so holding the lots in 1946 to 1949 is, of course, not conclusive as to how the property was held in the years 1956 to 1958, the years in which the sales that produced the gains involved herein, were made.

Petitioner argues that since the decision in the Court of Claims case was rendered in 1956, it is not reasonable to conclude that he thereafter continued to hold the lots for sale to customers in the ordinary course of his trade or business. However, an examination of the evidence herein discloses no change in the manner in which petitioner dealt with the property from the 1946 to 1949 period throughout the years here involved. Petitioner testified that at all times after the lots in the various units were platted, he was willing to sell any lot at any time to any person who wished to buy it at his asking price. Neither his willingness to sell lots nor his method of making sales changed. The evidence shows fewer sales per year in the period 1953 to 1958 than in prior years and that less of petitioner's time was devoted to the property in 1957 and 1958 than in 1946 to 1949. The record is clear, however, that the reduction in the number of sales was not due to any change in petitioner's method of selling. It was apparently a result of the fact that by the end of 1952 petitioner had sold 318½ out of the 387 platted lots, thus having a more limited choice of lots for prospective buyers. The time spent by petitioner in selling the property during 1957 and 1958 was that which was needed to make the sales in those years after the improvements to the property were complete. In prior years when improvements were being made on the property, more of petitioner's time was required.

Although the lots in unit 4 from which some of the sales in the years here involved were made were not filled and graded as were the lots in units 1, 2, and 3, the lots in this unit were being held and sold together with and treated in the same manner as the lots in the other units, both in 1948 and 1949, and in 1956, 1957, and 1958. These lots were therefore held for the same purpose as the other lots. Cf. *O'Donnell Patrick*, 31 T.C. 1175, 1181 (1959), affd. 275 F. 2d 437 (C.A.

7, 1960), and *Donald J. Lawrie*, 36 T.C. 1117 (1961). More of the lots in unit 4 were dedicated to business purposes than in units 1, 2, and 3, but this was because petitioner believed that these lots were more readily salable as business use lots. The petitioner did not put in the paved streets in unit 4 as he had in units 1, 2, and 3, but paved streets were put into this unit by the city with petitioner paying his proportionate assessment, thus improving the property in unit 4. Cf. *C. E. Mauldin*, 16 T.C. 698, 710 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952). The developmental improvements made to units 1, 2, and 3, as well as the streets put in by the city in unit 4, would tend to promote sales of the property and constituted sufficient promotion to sell the lots in the seller's market that existed in Borger, Texas, a city in which petitioner was well known as having the lots available for sale. *William E. Starke*, 35 T.C. 18, 29 (1960), on appeal (C.A. 9, 1961), and *Joseph M. Philbin*, 26 T.C. 1159, 1165 (1956).

From 1944 through 1958 petitioner sold 376½ of the total of his 387 lots in the Thompson Addition in 286 separate transactions with resulting net gains of $245,236.93, all important factors to be considered in determining whether petitioner was in the business of selling real estate. Cf. *John D. Riley*, 37 T.C. 932 (1962).

Petitioner cites and relies upon a number of cases in which it has been held that property was not held for sale in the ordinary course of a taxpayer's trade or business including *Eline Realty Co.*, 35 T.C. 1 (1960); *Wellesley A. Ayling*, 32 T.C. 704 (1959); *W. T. Thrift, Sr.*, 15 T.C. 366 (1950); *Frieda E. J. Farley*, 7 T.C. 198 (1946); *Cole* v. *Usry*, 294 F. 2d 426 (C.A. 5, 1961); and *Barrios' Estate* v. *Commissioner*, 265 F. 2d 517 (C.A. 5, 1959), reversing 29 T.C. 378 (1957).

The facts in each of these cases differ in certain particulars. There are various differences in the facts in all the cases cited by petitioner and those in the instant case. One major difference is that in none of the cases cited by petitioner had it been judicially determined that parts of the property were held by the taxpayer there involved in prior years for sale to customers in the ordinary course of his trade or business.

We hold that the lots sold by petitioner in the Thompson Addition from which gains were realized in 1957 and 1958 constituted property held by petitioner primarily for sale to customers in the ordinary course of his trade or business.

The loans by the Commodity Credit Corporation to petitioner in 1958 were made under an arrangement pursuant to law whereby petitioner's wheat was delivered to the Commodity Credit Corporation at the time of the loan, petitioner having the right to redeem the wheat at any time before March 31, 1959, by paying the face amount of the loan and accrued interest at the rate of 3½ percent per annum,

and if the wheat was not redeemed by March 31, 1959, it would be accepted on that date in full payment of the loan.

Although proceeds of loans are not generally income, section 77 of the Internal Revenue Code of 1954[2] provides that a taxpayer may make an election to treat proceeds from Commodity Credit Corporation loans as income in the year during which the loan proceeds are received. The election, once made, is irrevocable for that and all succeeding years without the obtaining of the permission of the Commissioner to make a change.

The parties have stipulated that prior to 1958 petitioner elected pursuant to section 77 of the Internal Revenue Code of 1954 to report Commodity Credit Corporation loan proceeds as taxable income in the year in which the proceeds were received and that petitioner has never applied for permission to change his method of accounting for Commodity Credit Corporation loan proceeds.

Petitioner contends that under section 77 of the Internal Revenue Code of 1954 only those commodity loans made during the taxable year which are not repaid and the commodity redeemed before the end of the taxable years should be treated as income. Petitioner contends that this interpretation of the statute is in accordance with annual accounting concepts requiring a taxpayer to account for gains and losses as of the end of a taxable year. Petitioner also argues that not to adopt his view would result in his being taxed twice on receipts from the same wheat, once in 1958 when he received the loans and again in 1959 when he sold the redeemed wheat, since the redemption of the wheat in December 1958 was not a purchase of the wheat creating a cost basis therefor. Petitioner also contends that respondent's treatment would, in effect, force petitioner with respect to the redeemed wheat to be on a crop inventory basis of accounting without his so electing and would distort his income for 1958 in that he would be charged with income with respect to the sale of wheat at the end of the taxable year when he has nothing to represent that income other than the wheat itself.

Respondent contends that under section 77 of the Internal Revenue Code of 1954 the entire amount of the Commodity Credit Corporation loan proceeds in 1958 became income immediately upon receipt thereof by petitioner, and that to allow petitioner to move the income from

---

[2] I.R.C. 1954.
SEC. 77. COMMODITY CREDIT LOANS.
(a) ELECTION TO INCLUDE LOANS IN INCOME.—Amounts received as loans from the Commodity Credit Corporation shall, at the election of the taxpayer, be considered as income and shall be included in gross income for the taxable year in which received.
(b) EFFECT OF ELECTION ON ADJUSTMENTS FOR SUBSEQUENT YEARS.—If a taxpayer exercises the election provided for in subsection (a) for any taxable year, then the method of computing income so adopted shall be adhered to with respect to all subsequent taxable years unless with the approval of the Secretary or his delegate a change to a different method is authorized.

1958 to 1959 by means of the wheat redemption would make a nullity of the irrevocable provisions of that section.

Respondent argues that for tax purposes a Commodity Credit loan should be treated as a sale of the wheat and a subsequent redemption of the wheat should be considered as a separate transaction comparable to a purchase of the wheat for the amount paid to redeem it, which amount would be its basis to be applied against any subsequent sale.

The statute provides that amounts received as loans from the Commodity Credit Corporation shall be considered as income and shall be included in gross income in the year received. This would imply that all loans received during the taxable year are to be considered as income, not just the ones remaining unredeemed at yearend. The committee reports [3] state that Commodity Credit Corporation loans should be treated for income tax purposes as though such commodities had been sold in the year of the loan for the amounts of the loan. If a loan is to be treated as a sale, the income arising therefrom arises at the time of the sale and not at some later time. Where the receipt of a Commodity Credit Corporation loan is considered as a sale of wheat, certainly a payment in redemption of the wheat should be considered as a repurchase of that wheat. Purchases of commodities by a farmer for resale do not affect his election as to crop inventory method of accounting or distort his annual income. Cf. *D. E. Alexander*, 22 T.C. 234 (1954). In many instances a gain on a sale is recognizable for tax purposes even though the proceeds of the sale have been spent, either in reacquisition of the assets sold or otherwise, before the end of the taxable year.

Since petitioner has elected to include Commodity Credit Corporation loans in income when received, he is bound by his election to so include all such amounts.

*Decision will be entered for the respondent.*

[3] S. Rept. No. 648, 76th Cong., 1st Sess., p. 8 (1939), 1939–2 C.B. 529.
"The attention of your committee has been drawn to the fact that loans by the Commodity Credit Corporation to producers of agricultural commodities, on the security of such commodities, though in form loans, should be treated for income-tax purposes as though such commodities had been sold in the year of the loan for the amount of the loan. * * *"